In the Interest of Carl LILLEY,
Appellee.

Appeal of Kathy LILLEY, Appellant.

Superior Court of Pennsylvania.

Argued June 16, 1998.
Filed Aug. 25, 1998.
Reargument Denied Nov. 5, 1998.

Leonard J. Frawley, Jr., Towanda, for appellant.

Mark W. Smith, Towanda, for appellee.

Patrick L. Beirne, Wysox, for David Lilley, participating party.

Richard D. Sheetz, Troy, for Bradford County Children & Youth Services, participating party.

Before McEWEN, President Judge, and DEL SOLE and TAMILIA, JJ.

TAMILIA, Judge:

Kathleen Lilley, the mother of Carl Lilley, appeals the Order terminating her parental rights and thereby freeing Carl for adoption by his foster parents of 14 years.

Carl was born on February 26, 1982, the child of David and Kathleen Lilley. In July 1983, Carl was placed in the care of Bradford County Children and Youth Services (CYS) by his mother because she could not care for him (N.T., 3/31/97, at 60–61). The CYS placement of Carl in the home of foster parents Kenneth and Louise Jones in 1983 continues to the present. The resulting bond with the Joneses has established a psychological and de facto relationship of parent and child. Carl wishes to be adopted by the Joneses, he has requested it, and they desire very much to be his legal parents. Carl is below average intelligence but has no special needs. His biological mother has limited intelligence and was a special education student. Her major disability appears to be depression and chronic mental illness which periodically required hospitalization.

While appellant has been able to sustain herself in independent living over the past seven years, she has not been able to achieve the goals of the various support agencies to prepare her for the return of Carl to her care. This has not been for lack of good faith effort on her part, but due to an inability to achieve the level of performance adequate for supervision and care of the child. The proposed exhaustive findings of fact and law submitted by the mother accurately set forth the matters for consideration by the court, however, the conclusions drawn therefrom are not supported under the law (Record # 19). Similarly, the court's findings of fact track those of the mother's (or vice versa), however, they draw opposite conclusions therefrom.

Fundamentally, appellant acknowledges the difficult and torturous life she has had since placement of Carl and the failed effort to bring about substantial and permanent change. Her argument is reduced to a plea that after 14 years, Carl should remain a foster child to permit her to retain her claim as mother until such time as Carl turns 18 and is free to be adopted by his foster parents. In order to maintain the legal mother-child relationship and in deference to Carl's wishes, she even has agreed to suspend visitation with him. While this has a poignant and heartfelt appeal to it, it does not produce a legally sustainable basis for overruling the Order of termination. Even under the most liberal interpretation of recent policy enunciated by federal and state law involving permanency planning and the "reasonable efforts" requirement for termination of parental rights, the mother cannot prevail. Pursuant to adoption legislation enacted in 1970, amended in 1980, 23 Pa.C.S. § 2511, **Grounds for involuntary termination,** provides in pertinent part:

**§ 2511. Grounds for involuntary termination**

(a) **General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental

rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(5).

The reasonable effort requirement has undergone considerable debate since its enactment and to some degree has become discredited, the option now offered being time limited effort, followed by immediate termination, followed by adoption within arbitrary time periods. The double disparity of inability of welfare services to provide essential rehabilitative services and the general failure of seriously dysfunctional parents to take advantage of those services within a reasonable time has resulted in a failure of the approach[1] and a resulting imprisonment of children in the limbo of lifelong (childhood) foster care which statutes such as 23 Pa.C.S. § 2511 were designed to eliminate. (*see* Amanda Spake, *Adoption Gridlock*, U.S. News and World Report, June 22, 1998, at 30.)

 This is a classic case of the inability of the child welfare system to correct the uncorrectable and to permit drift in foster care until the child announces a pathetic plea to be adopted and to be made a real part of the only family he has known. Appellant and her counsel pursue this appeal on the theory that the United States and Pennsylvania Constitutions guarantee the right of the parents to custody of their child and of the child to the right to be with his/her parents. As with any constitutional right, however, it is circumscribed by duties and when the fulfillment of duties and responsibilities upon which the right is founded are not implemented, the right must fail. The child, once intervention by the state has occurred on legitimate due process grounds, stands in a different relationship to the parents than a child in an intact family whose rights are protected and fulfilled by his parents. Removal of a child from his parents by the state can only occur on proof of neglect or dependency on the standard of clear and convincing evidence, *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), and upon establishment of clear necessity following petition, notice and hearing with the parent and child having the assistance of counsel. *See* Juvenile Act, 42 Pa.C.S. §§ 6301–6365. Likewise, termination of parental rights may occur only under the same very stringent standard. Since termination is in effect the equivalent of a death sentence to the familial relationship, the proof required upon thorough review is the highest order, clear and convincing evidence, followed by findings of clear necessity to justify its enactment. A careful and thorough review of this case establishes to our satisfaction that those standards have been met. The review of such a case by the appellate courts is also subject to the most sweeping scope of review. While appellant has not provided us with the customary statement of the scope and standard of review,[2] appellee/CYS, as permitted by Pa.R.A.P. 3518(b), **Brief of the Appellee**, has accurately stated it as follows:

In reviewing a termination of parental rights order, the Superior Court has a broad scope of review. This court must consider all of the evidence before the lower court as well as the lower court's finding of fact and conclusions of law. This court's standard of review is a narrow one. This court may not alter the lower court's decision unless this court finds lower court abused its discretion.

(Appellee/CYS Brief, at 1.) A more definitive exposition of the standard of review is contained in *In re Adoption of J.J. Phillips v. Children and Youth Services of Delaware County*, 511 Pa. 590,, 515 A.2d 883, 885–886 (1986), wherein the Supreme Court stated:

Our scope of review, as well as the burden of proof in involuntary termination cases, has been clearly defined and reiterated in several recent decisions by this

---

1. Patrick R. Tamilia, *A response to elimination of the reasonable efforts requirement prior to termination of parental rights*, 54 U. Pitt. L.Rev. No. 1, 211.

2. Pa.R.A.P. 3518, **Statement of the Scope and Standard of Review**, (a) **Brief of the Appellant**, states: "The brief of the appellant shall include, in addition to those matters enumerated in Rule 2111, a statement of the scope and standard of review for each contention. The statement shall be separately and distinctly entitled and set forth following the statement of jurisdiction."

Court. In *Matter of Adoption of G.T.M.*, 506 Pa. 44, 483 A.2d 1355 (1984), we stated:

> In cases where there has been an involuntary termination of parental rights by the Orphans' Court, the scope of appellate review is limited to the determination of whether the decree of termination is supported by competent evidence. *In re Adoption of B.D.S.*, 494 Pa. 171, 177, 431 A.2d 203, 206 (1981). If the decree is adequately supported by competent evidence, and the chancellor's findings are not predicated upon capricious disbelief of competent and credible evidence, the adjudication of the Orphans' Court terminating parental rights will not be disturbed on appeal. See *In re Adoption of M.M.*, 492 Pa. 457, 460, 424 A.2d 1280, 1282 (1981). It is established that, in a proceeding to involuntarily terminate parental rights, the burden of proof is upon the party seeking termination to establish by "clear and convincing" evidence the existence of grounds for doing so. *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re T.R.*, 502 Pa. 165, 166, 465 A.2d 642, 642–643 (1983).

*Id.* at 46, 483 A.2d at 1356.

*Also see In re Child M.*, 452 Pa.Super. 230, 681 A.2d 793, 797 (1996), *appeal denied*, 546 Pa. 674, 686 A.2d 1307 (1996).

In reviewing this case from the perspective of the above standard, we turn to the statement of issues presented by the mother:

I. Did the evidence presented at hearing clearly and convincingly establish that Kathleen Lilley's parental rights to Carl Lilley could and should be terminated under Section 2511(a)(1)(2)(3)(4) or (5) of the Adoption act 23 Pa.C.S.A. Section 2511(a)?

II. Did the evidence presented at hearing clearly and convincingly establish it was in Carl Lilley's best interest to have his mother's parental rights to Carl Lilley terminated?

(Appellant's Brief at 3.)

To both of these questions the court, after full hearing and evaluation of 14 years of foster care for Carl and failed attempts by the mother, answered yes. Our careful and full review of the record, briefs of counsel and findings of fact and Order of court requires that we affirm.[3]

■ Counsel for the mother skillfully cites principles of law and constitutional principles which sound noble and convincing in the abstract, but when applied to the facts of this case, widely and sadly miss the mark. As an appellate court we may not substitute our judgment and discretion for that of the trial court and, indeed, to do so in this case could only result in a resounding affirmance of that judgment. *See Adoption of J.J.* and *In re Child M.*, *supra*.

The fundamental test in termination of the parents' rights was long ago cited in *In re Geiger*, 459 Pa. 636, 331 A.2d 172 (1975). There, the Pennsylvania Supreme Court announced that pursuant to section 311(2) of the Adoption Act of 1970, now section 2511(a)(2) of the Adoption Act, the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *Id.* at 639, 331 A.2d at 174.

In keeping with the requirements of *Santosky*, *supra*, the evidence required for termination of parental rights must be clear and convincing evidence, which standard our Supreme Court has carefully articulated in *Adoption of J.J.*, *supra*, as follows:

> In *LaRocca Trust*, 411 Pa. 633, 192 A.2d 409 (1963), we articulated what is required

---

**3.** Since no exceptions were filed, this is a final appealable Order pursuant to the Rules of Appellate Procedure. Orphans' Court procedure treats all decrees final unless the aggrieved party files exceptions. Bradford County Orphans' Court Rule 3.1–1 Decree, Bradford County Orphans' Court Rule 7.1–1—7.1–3, Exceptions. *See* 42 Pa.C.S. §§ 5101, 5102, Pa.R.A.P. 341(a) and 501.

in order to meet the clear and convincing burden of proof:

> The witnesses must be found to be credible, that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order, and that their testimony is so clear, direct, weighty, and convincing as to enable the [trier of fact] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. . . . It is not necessary that the evidence be uncontradicted . . . provided it "carries conviction to the mind" or carries "a clear conviction of its truth" . . . (Citations omitted.)

*Id.,* at 640, 192 A.2d at 413.

*Id.* at 595–96, 515 A.2d at 886.

In conformity with these requirements, CYS of Bradford County proved and the court found as fact (1) the mother placed the child with CYS of Bradford County in 1983 as she could not care for him and (2) despite her best efforts in the intervening 14 years, due to mental illness and limited mental capacity, she could not assume the role of parent and had not exercised that role except for limited visits, and despite the provisions of the best resources available through Bradford County CYS to the mother, she is presently and for the foreseeable future incapable of fulfilling the role of mother and caretaker for Carl. To culminate this exposition of failure is the overwhelming desire of Carl to bring certainty, permanency and finality into his relationship with the foster parents who want him to be their child not only psychologically and de facto but legally in the eyes of the law. What the mother attempts to preserve is her sense of worth by holding on to the illusion of motherhood. In doing so, she would deny her child, in name only, the right to be totally assimilated into the only family he has known. The price he would pay is too high to satisfy her need. Some times the greatest act of love a parent can express is to let the child go. Such is the case here.

We have dealt with the issue of parental rights from many perspectives and the law has shifted its balance to the best interest of the child when his/her biological parents have failed in their duty, intentionally, by neglect or in self-serving and thoughtless actions. The child's right is to appropriate custodial care and we may not deny him a wholesome and binding family relationship under the rubric of a superior constitutional right to live with or remain legally attached to his/her biological parent. These determinations flow from a fundamental need to protect the child in the critical most defenseless years of his development and for the good of society and the best interest of the child. The shelter of a functional family has a higher value than the esoteric right to have contact with the person who claims biological parentage but who fails to fulfill the duties of a parent.

In the situation involving foster care and child dependency, the law clearly has favored the child once the family relationship has been disrupted due to parental neglect requiring the child to be removed from the home and placed in foster care under state/county supervision. "Once a child has been adjudicated dependent . . . the issue of custody and continuation of foster care are determined according to a child's best interest." *In Interest of Sweeney,* 393 Pa.Super. 437, 574 A.2d 690, 691 (1990), *appeal denied,* 526 Pa. 649, 585 A.2d 469 (1991). *See In re J.S.W.,* 438 Pa.Super. 46, 651 A.2d 167 (1994) (Following an adjudication of dependency, only the child's best interests, not those of the parents, are to be considered when changing the goal of the family service plan from reunification to adoption.).

The duty of the court under the Juvenile Act to provide rehabilitative services to the parent of a dependent child[4] is recognized as a correlative responsibility, with that of the parent, to satisfy the mandate contained in the Adoption Act, prior to CYS proceeding to petition for involuntary termination of parental rights pursuant to section 2511(a). In actuality, the legislative scheme in compliance with federal law establishes a child welfare system that attempts to facilitate maintenance of the child in its home and to return him as soon as conditions improve

---

4. 42 Pa.C.S. § 6351, **Disposition of dependent child,** (b) **Required preplacement findings.**

sufficiently to warrant it. This is clearly spelled out in *Fallaro v. Yeager*, 364 Pa.Super. 408, 528 A.2d 222 (1987).

[T]he current thrust of child dependency actions is directed toward permanency planning. Pursuant to Public Law 96–272, June 17, 1980, Adoption Assistance and Child Welfare Act of 1980, the states are mandated to provide numerous services to families and children if they are to be eligible for federal matching funds for those services. Pennsylvania, through the Department of Welfare and the County Children and Youth Services offices, has fully implemented these services. Paramount to compliance is the requirement of due process and an appropriate judicial determination that removal of a child from his home was required. 55 Pa.Code § 3130.71(a). Prior to removal is the requirement that the agency make reasonable effort to prevent removal. 62 P.S. § 701 *et seq.;* 55 Pa.Code §§ 3130.11, 3130.–13, 3130.35–3130.42. The federal and state law requires periodic court monitoring, which is the role of the Juvenile Court, 42 Pa.C.S. § 6351, 55 Pa.Code § 3130.71, and it also involves case plans for services for the child, parents and foster parents (55 Pa.Code § 3130.67) to: (1) improve conditions in the home (§ 3130.67(6)(7)(8)); and (2) facilitate child's return home or plan for permanent placement (§ 3130.61–67).

Ultimately, the goal is to rehabilitate the family, reunite the child with his family or, after reasonable efforts over an appropriate period of time have failed, to terminate parental rights and free the child for adoption pursuant to the Adoption Act of 1980, Subchapter B **Involuntary Termination,** 23 Pa.C.S.A. § 2511(a).

*Id.* 528 A.2d at 229. The court, however, recognizes that such a duty has reasonable limits. As detailed above, if a parent fails to cooperate or appears incapable of benefiting from the reasonable efforts supplied over a realistic period of time, the agency has fulfilled its mandate and upon proof of satisfaction of the reasonable good faith effort, the termination petition may be granted. *In re J.W.*, 396 Pa.Super. 379, 578 A.2d 952 (1990).

Recently, however, in response to the limited effectiveness of the permanency planning policy, Congress has revisited this concept and enacted P.L. 105–89, **Adoptions and Safe Families Act,** 1997. While at this time the Act has not been sufficiently implemented with enabling legislation in Pennsylvania for guidance by this Court, its implications are clear. Section 101, **Clarification of the reasonable efforts requirement,** states:

(a) In General.—Section 471(a)(15) of the Social Security Act (42 U.S.C. 671(a)(15)) is amended to read as follows:

"(15) provides that—

"(A) in determining reasonable efforts to be made with respect to a child, as described in this paragraph, and in making reasonable efforts, *the child's health and safety shall be the paramount concern;*

"(B) except as provided in subparagraph (D), reasonable efforts shall be made to preserve and reunify families—

"(i) prior to the placement of a child in foster care, to prevent or eliminate the need for removing the child from the child's home; and

"(ii) to make it possible for a child to safely return to the child's home;

"(C) *if continuation of reasonable efforts of the type described in subparagraph (B) is determined to be inconsistent with the permanency plan for the child, reasonable efforts shall be made to place the child in a timely manner in accordance with the permanency plan, and to complete whatever steps are necessary to finalize the permanent placement of the child;*

"(D) *reasonable efforts of the type described in subparagraph (B) shall not be required to be made with respect to a parent of a child if a court of competent jurisdiction has determined that—*

"(i) *the parent has subjected the child to aggravated circumstances* (as defined in State law, *which definition may include but need not be limited to abandonment, torture, chronic abuse, and sexual abuse);*

"(I) *committed murder (which would have been an offense under section 1111(a) of title 18, United States Code, if the offense had occurred in the special maritime or territorial jurisdiction of the United States) of another child of the parent;*

"(II) *committed voluntary manslaughter (which would have been an offense under section 1112(a) of title 18, United States Code, if the offense had occurred in the special maritime or territorial jurisdiction of the United States) of another child of the parent;*

"(III) *aided or abetted, attempted, conspired or solicited to commit such a murder or such a voluntary manslaughter;* or

"(IV) *committed a felony assault that results in serious bodily injury to the child or another child of the parent;* or

"(iii) *the parental rights of the parent to a sibling have been terminated involuntarily*[."]

(Emphasis added.)

■ The amendments make clear that the health and safety of the child supercede all other considerations. It also enumerates, without limiting, the types of parental behavior involving violence and homicide to family members that preclude the necessity to enter into a reasonable effort to maintain or restore the family relationship. The Act goes further and requires the states to take affirmative action to terminate parental rights under circumstances wherein the child's parental environment would be dangerous. Section 103 states:

**Sec. 103. States Required to Initiate or Join Proceedings to Terminate Parental Rights for Certain Children in Foster Care.**

(a) Requirement for proceedings.—Section 475(5) of the Social Security Act (42 U.S.C. 675(5) is amended)—

. . .

(3) by adding at the end the following:

"(E) in the case of a child who has been in foster care under the responsibility of the State for 15 of the most recent 22 months, or, if a court of competent jurisdiction has determined a child to be an abandoned infant (as defined under State law) or has made a determination that the parent has committed murder of another child of the parent, committed voluntary manslaughter of another child of the parent, aided or abetted, attempted, conspired, or solicited to commit such a murder or such a voluntary manslaughter, or committed a felony assault that has resulted in serious bodily injury to the child or to another child of the parent, the State shall file a petition to terminate the parental rights of the child's parents (or, if such a petition has been filed by another party, seek to be joined as a party to the petition), and, concurrently, to identify, recruit, process, and approve a qualified family for an adoption, unless—

"(i) at the option of the State, the child is being care for by a relative;

"(ii) a State agency has documented in the case plan (which shall be available for court review) a compelling reason for determining that filing such a petition would not be in the best interests of the child; or

"(iii) the State has not provided to the family of the child, consistent with the time period in the State case plan, such services as the State deems necessary for the safe return of the child to the child's home, if reasonable efforts of the type described in section 471(a)(15)(B)(ii) are required to be with respect to the child.".

The law would impel state action to terminate parental rights in the category of situations enumerated and establish a designated time frame (15 of the most recent 22 months) within which termination proceedings would be commenced.

Finally, by including a definition of legal guardianship, the Act creates a new category

of caretaker between that of foster parent and adoptive parent.

(b) Definition of Legal Guardianship.— Section 475 of such Act (42 U.S.C. 675) is amended by adding at the end the following:

.''(7) The term 'legal guardianship' means a judicially created relationship between child and caretaker which is intended to be permanent and self-sustaining as evidenced by the transfer to the caretaker of the following parental rights with respect to the child: protection, education, care and control of the person, custody of the person, and decisionmaking. The term 'legal guardian' means the caretaker in such a relationship.''.

P.L. 105–89, **Adoptions and Safe Families Act,** § 101(b)(7). The full impact of this legislation will require some time to be felt and, presently, our Commonwealth's Office of Children, Youth and Families has reached the point of issuing advisory bulletins to courts dealing with termination cases as well as state, county and private children and youth systems. It is fair to say, however, the type of drift we see in this case will not be tolerated for numerous reasons under the new legislation.[5]

■ Unquestionably, this case falls under the mandate of the following sections relating to termination of parental rights: section 2511(a)(1)—conduct of parents existing at least six months immediately preceding the filing of the petition evidencing a settled intent to relinquish or failure to perform parental duties; section 2511(a)(2)—the repeated and continued neglect or refusal of the parent has caused the child to be without essential parental care, control and subsistence necessary for the child's physical or mental well being and the causes will not be remedied by the parents; and section 2511(a)(5)—the child has been removed from the parents by the court and the conditions which led to placement of the child continue to exist and have not been remedied within a reasonable time and termination of parental rights would best serve the needs and welfare of the child. Having established by clear and convincing evidence that her failure for over 14 years to fulfill the requirements of the law for return of Carl, the mother cannot be heard to complain that the agency and the court have failed to fulfill their responsibility under the reasonable effort requirement to prepare her for his return.

This case illustrates a serious and costly problem in human lives and public monies relating to the gridlock of foster care in this country. *Adoption Gridlock, supra,* graphically presented the statistics, research, as to the consequences, and the cost of the failure

---

5. The "OCYF Bulletin", 3130–98–01, opens as follows:

*BACKGROUND:*

On November 19, 1997 President Clinton signed the Adoption and Safe Families Act of 1997 (ASFA), Public Law 105–89, which amends the Titles IV–B and IV–E of the Social Security Act. ASFA establishes unequivocally that the goals for children in the child welfare system are *safety, permanency and well-being*. The law intends to make the child welfare system more responsive to the multiple, frequently complex, needs of children and their families. While affirming the need to forge linkage between the child welfare system and other support systems for families, the child welfare system and the courts, the law reaffirms the need to assure the safety and well-being of children and their families. The law provides renewed impetus to dismantling the barriers to permanence existing for children in placement and the need for permanency for these children.

ASFA embodies several key principles that must be considered in implementing the law:
- The child's safety is the paramount concern. All decisions made must be based on the child's safety and well-being.
- Substitute care is a temporary setting. It *is not a place for children to grow up*. For children who cannot safely return home, the law provides for an expedited process to find these children permanent homes.
- Permanency planning for children begins as soon as the child enters substitute care. From the time a child enters placement, the agency must be diligent in finding a permanent family for the child.
- The practice of *concurrent planning* is encouraged by ASFA to facilitate finding a permanent home for a child in a timely manner.
- Achieving permanency for children requires timely decisions from all elements of the child serving system.
- Innovative approaches are needed to produce change. The law envisions real change in the child welfare program.

to move children from foster care to adoptive homes.

On any given day in the United States at least 107,000 of the 507,000 children currently in foster care are waiting for adoption, according to the Child Welfare League of America.

. . .

Despite the abundance of available children, adoption from public agencies have for more than a decade remained about 20,000 per year—a number that makes up only 16 percent of the 125,000 children adopted in the United States last year.

. . .

The disparity between the number of kids in foster care who need homes and the number who are adopted spurred President Clinton in 1996 to ask for new legislation aimed at doubling the number of public adoptions by 2002 and giving foster children 'what should be their fundamental right—a chance at a decent, safe home.' In response, Congress last November passed the Adoption and Safe Families Act, designed to increase public adoptions and to speed up the adoption process.

*Id.* at 31.

■ Contrary to what the mother alleges in this case, the basic right guaranteed by the constitution of a parent's right to custody and rearing of his/her child is converted by failure of the parent to fulfill his/her duty to the right of the child to have proper parenting and fulfillment of his potential in a permanent, healthy, safe environment. The solution suggested by the mother of continued foster placement is unacceptable and totally disregards the best interest of the child. The *Adoption Gridlock* article chronicles the incredible harm to children who are in long-term foster placement and the burden it places on society.

Children who have stable, predictable care 'can overcome great adversity,' says Richard Gelles, director of the Family Violence Research program at the University of Rhode Island and an architect of the Adoption and Safe Families Act. Converse-ly, adults who grow up in temporary homes often suffer: Studies have shown that anywhere from 15 percent to 56 percent never complete high school or earn a GED. The majority hold low-skilled jobs; up to 50 percent spend some time on public assistance. Drug use is common. Nearly one third of males commit crimes as adults. Among the homeless, as many as 39 percent spent years in foster care as kids.

*Id.* at 31.

The report goes on to document the cost to the taxpayers with the use of foster homes as a primary child care vehicle rather than as a pass through program, as originally intended, to return children to other homes within a reasonable time or to free them for adoption.

Keeping these kids stuck in temporary homes is not only devastating to the kids—it has been a fiscal disaster. The federal payment for foster care, 55 percent of the total, grew 438 percent in the past decade to about $3.5 billion this year. Foster care's payment structure actually discourages adoption—the more kids in foster care, the more money states get from the federal government for their overall programs, since 50 percent of foster care funds go to administrative costs, including social worker salaries. A 1993 study estimated that the adoption of 40,700 kids between 1983 and 1987 saved $1.6 billion in taxpayer dollars—mostly in administrative costs.

*Id.* at 31.

In conclusion, the arguments and issues presented by the mother are without merit and the Order of the trial court in terminating parental rights of the mother (and father who consented) is overwhelmingly supported by the record and the law. Carl, now that he is free to be adopted, is entitled to the security and stability of adoption by the only true parents he has known.

Order affirmed.

McEWEN, President Judge, concurs in the result.