J-S10045-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

IN RE: ADOPTION OF J.D.M., JR.     :     IN THE SUPERIOR COURT OF
    :     PENNSYLVANIA
    :
    :
APPEAL OF: C.M., MOTHER     :     No. 3090 EDA 2014

Appeal from the Order Entered September 29, 2014
In the Court of Common Pleas of Montgomery County
Orphans' Court at No(s): 2013-A0196

IN RE: ADOPTION OF C.D.M.     :     IN THE SUPERIOR COURT OF
    :     PENNSYLVANIA
    :
    :
APPEAL OF: C.M., MOTHER     :     No. 3091 EDA 2014

Appeal from the Order Entered September 29, 2014
In the Court of Common Pleas of Montgomery County
Orphans' Court at No(s): 2013-A0195

BEFORE: GANTMAN, P.J., STABILE, J., AND PLATT, J.*

MEMORANDUM BY GANTMAN, P.J.:     **FILED FEBRUARY 12, 2015**

Appellant, C.M. ("Mother"), appeals from the orders entered in the Montgomery County Court of Common Pleas Orphans' Court, which granted the petition of Appellee, the Montgomery Office of Children and Youth Services ("OCY"), for involuntary termination of Mother's parental rights as to her minor children, J.D.M. and C.D.M. ("Children").[1] We affirm.

---

[1] Children's birth father is not a party to this appeal. He voluntarily relinquished his parental rights to Children at the termination hearing on March 19, 2014.

---

*Retired Senior Judge assigned to the Superior Court.

In its opinion, the Orphans' court fully and correctly sets for the relevant facts and procedural history of this case. Therefore, we have no reason to restate them.

Mother raises several issues for our review:

> WHETHER THERE WAS SUFFICIENT EVIDENCE TO SUPPORT THE FINDINGS OF THIS HONORABLE COURT THAT [OCY] PROVED BY CLEAR AND CONVINCING EVIDENCE THE REQUIREMENTS OF 23 PA.C.S.A. [§] 2511(A)(1), (2) AND (8) FOR THE INVOLUNTARY TERMINATION OF [MOTHER'S] PARENTAL RIGHTS?
>
> WHETHER THIS HONORABLE COURT ABUSED ITS DISCRETION IN FINDING THAT THE CAUSES OF THE ALLEGED INCAPACITY, ABUSE, NEGLECT OR REFUSAL CANNOT OR WILL NOT BE REMEDIED BY [MOTHER] PURSUANT TO 23 PA.C.S.A. [§] 2511(A)(2), WHEN [OCY] FAILED TO MAKE REASONABLE ACCOMMODATIONS FOR [MOTHER'S] DISABILITIES, AND FAILED TO PROVIDE MEANINGFUL ASSISTANCE IN MAINTAINING STABLE HOUSING AND OTHER SERVICES?
>
> WHETHER THIS HONORABLE COURT ABUSED ITS DISCRETION IN TERMINATING THE PARENTAL RIGHTS OF [MOTHER] ON THE BASIS OF ENVIRONMENTAL FACTORS SUCH AS INADEQUATE HOUSING, FURNISHINGS, INCOME, CLOTHING AND MEDICAL CARE, WHEN THOSE FACTORS WERE BEYOND [MOTHER'S] CONTROL PURSUANT TO 23 PA.C.S.A. [§] 2511(B), AND WHEN [OCY] FAILED TO MAKE REASONABLE ACCOMMODATIONS FOR [MOTHER'S] DISABILITIES AND FAILED TO PROVIDE MEANINGFUL ASSISTANCE IN MAINTAINING STABLE HOUSING AND OTHER SERVICES?
>
> WHETHER THIS HONORABLE COURT ABUSED ITS DISCRETION IN FINDING THAT THE DEVELOPMENTAL, PHYSICAL AND EMOTIONAL NEEDS AND WELFARE OF [CHILDREN] WILL BE BEST SERVED BY THE TERMINATION OF [MOTHER'S] PARENTAL RIGHTS PURSUANT TO 23 PA.C.S.A. [§] 2511(B), WHEN THERE IS A STRONG AND LOVING BOND BETWEEN [MOTHER] AND THE CHILDREN,

AND SEVERANCE OF THAT BOND WILL CAUSE IRREPARABLE HARM TO THE CHILDREN?

WHETHER THIS HONORABLE COURT ERRED IN GRANTING [OCY'S] PETITION TO CHANGE THE GOAL FROM REUNIFICATION TO ADOPTION WHEN THE GOAL OF REUNIFICATION REMAINS THE MOST APPROPRIATE AND FEASIBLE GOAL BASED ON THE STATUTORY FACTORS SET FORTH IN 42 PA.C.S.A. [§] 6351(F)?

WHETHER THIS HONORABLE COURT ERRED IN GRANTING [OCY'S] PETITION TO CHANGE THE GOAL FROM REUNIFICATION TO ADOPTION WHEN [OCY] FAILED TO MAKE REASONABLE EFFORTS TO FINALIZE THE PERMANENCY PLAN GOAL OF REUNIFICATION?

WHETHER THIS HONORABLE COURT HAD SUFFICIENT EVIDENCE TO DETERMINE THE APPROPRIATENESS OF CHANGING THE GOAL FROM REUNIFICATION TO ADOPTION WHEN THE COURT DID NOT CONSULT WITH THE CHILDREN REGARDING THE PERMANENCY PLAN PURSUANT TO 42 PA.C.S.A. [§] 6351(E)(1)?

(Mother's Brief at 4-5).[2]

Appellate review in termination of parental rights cases implicates the following principles:

In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting *In re I.J.*, 972

---

[2] Mother's brief on appeal presents no legal argument based on Section 6351, as recited in Mother's issues 5 through 7. Mother merely quotes the statute and draws conclusions based on her interpretation of the facts and circumstances of the case. Therefore, we give these issues no further attention.

J-S10045-15

A.2d 5, 8 (Pa.Super. 2009)).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.
>
> *In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*)*, appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).
>
> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.
>
> *In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. *In re R.L.T.M.*, 860 A.2d 190, 191[-92] (Pa.Super. 2004).

*In re Z.P., supra* at 1115-16 (quoting *In re Adoption of K.J.*, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008)).

After a thorough review of the record, the briefs of the parties, the

applicable law, and the well-reasoned opinion of the Honorable Lois E. Murphy, we conclude Mother's issues merit no relief. The Orphans' court opinion comprehensively discusses and properly disposes of the questions presented. (*See* Orphans' Court Opinion, filed September 29, 2014, at 5-17) (finding: Children were removed from Mother on September 21, 2011, at Mother's own initiative by calling OCY; Mother suffers from multiple medical and mental health issues, including multiple sclerosis and bipolar disorder; Mother acknowledges history of drug abuse, including abuse of prescription drugs, methamphetamines, amphetamines, and cocaine; Mother, for some time, actively worked toward reunification with Children per OCY's goals; however, among other circumstances, Children's birth father was released from jail and took from Mother money meant for housing, and Mother subsequently lost housing; Mother appeared intoxicated on some visits with Children; Mother missed approximately 50 percent of visits and 60 percent of scheduled phone calls; Mother allowed birth father to be present on unsupervised visits with Children, though birth father was not to attend because he was found intoxicated previously while around Children; Mother failed to obtain recommended long-term outpatient psychotherapy; Mother tested positive in drug tests on at least eight occasions; Mother acknowledged history of health, financial, and housing instability; Mother refused to provide current address to OCY caseworker; Mother is unable to provide Children with essential parental care, control, or

sustenance necessary for their physical and mental well-being; the causes of Mother's incapacity, abuse, neglect, or refusal cannot or will not be remedied; Mother has not provided housing, met Children's needs, or maintained consistent parent-child relationship; OCY proved by clear and convincing evidence that Mother failed and refused to perform her parental duties for 36 months, beyond 6-month period prior to filing of petitions; conditions leading to placement of Children continue to exist and cannot or will not be remedied by Mother; Mother lacks capacity to meet all obligations of providing safe, secure, and nurturing home for Children; OCY met its burden of proof under Section 2511(a)(1), (a)(2), and (a)(8); per Section 2511(b), parental bond between Mother and Children is attenuated; Children have developed significant bond with foster parents; Children are very well loved and entrenched in foster home; Children's emotional needs and welfare are best met by termination of Mother's parental rights, and Children will not suffer irreparable harm as result of termination; OCY made reasonable efforts to attempt to reunify Children with Mother, but court found adoption appropriate; OCY established basis for terminating Mother's parental rights to Children).   Accordingly, we affirm the termination of Mother's parental rights to Children on the basis of the Orphans' court opinion.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/12/2015

THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY,
PENNSYLVANIA

ORPHANS' COURT DIVISION

# IN RE: ADOPTION OF J.D.M., JR.
# IN RE: ADOPTION OF C.D.M.

## ORPHANS' CT. NUMBER: 2013-A0196
## ORPHANS' CT. NUMBER: 2013-A0195

## OPINION

**Murphy, J.**                                               September 7, 2014

Before me are Petitions to Terminate the Parental Rights of Birth Mother, C.M., to her two sons, J.D.M., Jr. who was born February/2009 and is 5 ½ years old, and C.D.M., who was born July/2007 and is 7 years old. The Petitions were filed on October 17, 2013 and allege 3 grounds as a basis for terminating parental rights. These grounds are found in § 2511(a)(1), § 2511(a)(2), and 2511(a)(8) of the Adoption Act. If any one of these grounds is established and proven, by clear and convincing evidence, then termination of rights will occur. The Office of Children & Youth of Montgomery County (hereinafter "OCY") filed Petitions to Terminate the Parental Rights of Birth Father, J.M., with respect to each of the children, C.D.M. and J.D.M., Jr. On March 19, 2014 in open court, the Birth Father requested modification of the Petition to be a Petition to Confirm the Voluntary Relinquishment of Parental Rights with respect to each of the children. In open court, J.M. voluntarily, deliberately and knowingly relinquished all of his parental



2013-A0196.10          FilingID: 1683263
1925(a) Opinion
Receipt # Z153543               Fee $0.00
D. Bruce Hanes, Esq. - MontCo Register of Wills
9/29/2014 2:52:33 PM - M. J D JR

rights to each of the children on March 19, 2014. J.M. was represented by counsel and had an adequate opportunity to consult with his counsel before relinquishing his parental rights. Based upon this relinquishment, the Court concluded that his relinquishment of parental rights was voluntary and has concluded that it is appropriate to enter a Final Decree terminating all of his parental rights with respect to C.D.M. and J.D.M., Jr.

The Office of Children & Youth requested that this Court proceed to a hearing on its Petitions for Involuntary Termination of Parental Rights of Birth Mother, C.M. and its applications to change the goal in these proceedings to adoption. The Court conducted a joint permanency review hearing to consider the request for a change of goal and termination of parental rights hearing with respect to Birth Mother, C.M.

With respect to the Petition for Involuntary Termination of Birth Mother's Parental Rights, OCY must prove its case by clear and convincing evidence. The standard of clear and convincing evidence as a threshold to termination was established by the United States Supreme Court in the case of Santosky v. Kramer, 455 U.S. 745 (1982). This standard is defined as testimony that is so clear, direct, weighty and convincing as to enable me to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. It is not necessary that the evidence be uncontradicted . . . provided it 'carries conviction to the mind' or carries 'a clear conviction of its truth.' LaRocca Trust, 411 Pa. 633, 192 A.2d 409 (1963).

The requirements under 2511(a)(1) are as follows: "The parent has failed or refused to perform parental duties for the 6 months immediately preceding the filing of the Petition; or has evidenced a settled purpose of relinquishing his [or her] parental claim to the child."

2

Section 2511(a)(2) provides that the repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

Under 2511(a)(8), the test is: "The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child."

With respect to the alleged ground under section (a)(8), the children have been removed from the care of the parent from September 21, 2011 until present, a period of 36 months.

With respect to this ground (a)(8), the time period having been satisfied, the principal question I must answer is whether the conditions that led to removal of the children from the home continue to exist as of the time the Petition was filed. I must also determine whether termination of parental rights will best serve the needs and welfare of the children.

Under ground (a)(1) I must consider whether the parent has failed or refused to perform parenting responsibilities for the six months preceding the filing of the petition; or whether the parent has evidenced a settled purpose of relinquishing a parental claim.

Under section (a)(2), I must consider whether OCY has proven abuse or neglect by clear and convincing evidence or whether OCY has proven incapacity to parent. In

3

this case, there has been no proof of abuse of the children. Therefore, I must evaluate whether OCY has proven by clear and convincing evidence that the parent lacks the capacity to parent the children, and to provide the minimum requirements to which all children are entitled.

The Pennsylvania Superior Court has identified certain irreducible minimum requirements to which all children are entitled from their parents, including adequate housing, clothing, food, love and supervision. *In re Diaz,* 669 A.2d 372 (Pa. Super. 1995). "The necessary implication is that a parent who cannot or will not meet the irreducible minimum requirements within a reasonable time following state intervention may properly . . . have parental rights terminated." *In re J.W., A.W., V.W. and J.W.,* 396 Pa. Super. 379, 390-91, 578 A.2d 952, 958 (1990). Thus a petition seeking to terminate parental rights may be based upon a lack of capacity even in the absence of affirmative misconduct. *In re E.M.,* 533 Pa. 115, 620 A.2d 481 (1993).

The Supreme Court of Pennsylvania has held that it is not a violation of constitutional rights for an individual's parental rights to be terminated due to the parent's disabilities or handicaps that prevent the parent from being able to provide proper care for the parent. *In re William L.,* 477 Pa. 322, 383 A.2d 1228 (1978). As the Supreme Court explained in reaching its decision:

> A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The Legislature, however, in enacting the . . . Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties. 383 A.2d at 1239.

4

For example, in *In the Interest of Lilley*, the trial court terminated the parental rights of a mother who suffered from depression and chronic mental illness. *In the Interest of Lilley*, 719 A.2d 327 (Pa. Super. 1998). In upholding the decision of the lower court, the Superior Court noted that the natural mother had not been able to sustain herself in independent living and had not been able to achieve the family service plan goals that would permit reunification with her son. *Id.* at 328. "She could not assume the role of parent and had not exercised that role except for limited visits, . . . and is presently and for the foreseeable future incapable of fulfilling the role of mother and caretaker" for her child. *Id.* at 331. In cases in which the parent is incapable of providing basic necessities and will continued to suffer such parental incapacity, the focus of the Court must be not on the parent's wishes and desires, but the child's need for security, safety, permanency and well-being. *Id.* at 334 (*citing* Adoptions and Safe Family Act, § 101(b)(7)). "The child's safety is the paramount concern. . . . Substitute care is a temporary setting. It is not a place for children to grow up." Adoptions and Safe Family Act, § 101(b)(7).

The following facts were developed at the hearing. The Birth Mother, C.M., (hereinafter "Birth Mother") called OCY on her own initiative requesting assistance with her children on or about June 27, 2011. Birth Mother, according to her own testimony and the testimony of the caseworkers, suffers from multiple medical and mental health issues, including bipolar disorder. She also reports that she suffers from multiple sclerosis. N.T. p. 184. In addition, Birth Mother acknowledges a history of drug abuse, including abuse of prescription drugs, both prescribed and unprescribed for her, as well as illegal substances, including methamphetamines, amphetamines, and cocaine. Birth

5

Father also has a history of drug use and incarceration for periods of time and was incarcerated at the time of the hearing.

In June 2011, Birth Mother concluded that she was struggling to care for her children due to limited financial resources, her health and mental health issues and a lack of adequate housing. At Birth Mother's request, OCY took custody of the children and placed them in a foster home in September of 2011. Between September and November of 2011, OCY was contacted by a family member who wished to offer her home as a placement for the two children. The foster mother, R.M., testified that she took the two boys into her home in an effort to be of assistance to her family members and that she expected the placement to be for a short term of possibly six (6) months to a year while the birth parents obtained financial and housing security. N.T. p. 59.

In approximately December of 2011, Birth Mother and Birth Father leased an apartment in Boyertown. During the time that the birth parents had the apartment, OCY caseworker noted that Birth Mother was making good progress on achieving the goals of her family service plan. The caseworker noted, as did Birth Mother that she was "really working hard" to achieve her goals and to reunify with her children. She had obtained an apartment, obtained employment, and was working effectively with her OCY caseworker and also with a time limited family reunification caseworker. She had affectionate and successful visits with her children on a weekly basis. OCY increased her visits to overnight weekend visits at her apartment. OCY was actively working toward reunifying Birth Mother with her children in September and October of 2012. In approximately October 2012, however, when the Birth Father was released from jail and returned to the apartment, issues arose that caused significant challenges for Birth Mother. She reported

6

to OCY that the Birth Father took money from the apartment that she had been planning to use for rent. With the assistance of OCY, she received some emergency housing assistance to help her maintain her apartment. Incidents of violence occurred at the residence when the Birth Father was home, according to Birth Mother's testimony. In February of 2013, the Birth Mother lost the apartment. She had not advised OCY that she was at risk of losing the apartment. During this period according to her own testimony, she became very depressed as a result of numerous setbacks, including the loss of her apartment, trouble in her relationship with her husband and the continuing placement of her children in foster care.

R.M., the foster mother who supervised many of the visits between Birth Mother and her children described certain problems that have occurred with regard to Birth Mother's visits with the children and phone calls to the children. For example, on March 12, 2013, when the children were visiting Birth Mother at their maternal grandmother's home, the foster mother arrived to find Birth Mother and her mother "screaming and yelling" at each other and broken glass on the living room floor. N.T. pp. 29-31. She described the situation as very loud and testified that the children were crying. She said that the two children were very upset driving back to her home, but that she was able to calm them down with their usual nighttime routine. N.T. pp. 29-32.

R.M. also testified that Birth Mother has at times cancelled visits or been unable to make visits due to a lack of transportation. She explained that when their Birth Mother failed to appear at a visit, this was upsetting to both of the boys. N. T. pp. 32-33. She estimated that Birth Mother failed to arrive for scheduled visits approximately three times during the summer of 2012 and also failed to arrive for at least two visits at OCY.

7

Although, for the most part, the witnesses described Birth Mother's behavior at visits at generally appropriate and affectionate, R.M. testified that there were times when Birth Mother appeared under the influence. N.T. p.p. 33-34. R.M. explained that by observing Birth Mother's speech, her walking and her behavior in general, she concluded that at times she was under the influence at visits with the children. N.T. p. 34. Birth Mother missed approximately 50% of the visits that foster mother tried to arrange with the Birth Mother. Birth Mother has never visited the pre-school or school attended by either of the children. Although the foster mother agreed that Birth Mother should call the children once a week on Sunday evenings, she reported that Birth Mother did not call consistently and that only approximately 40% of the scheduled phone calls were made, with the result that Birth Mother missed the opportunity to call the children approximately 60% of the time. On at least five of the phone calls with their Birth Mother, the foster mother noted that the children were upset because of some of the things she said to them over the phone and on at least one occasion, she appeared to be under the influence when she made a phone call to the children. N.T. pp. 34-37.

The foster mother also noted that the Birth Mother engaged in inappropriate behavior in front of the children, including fighting and arguing with other people including Birth Father, Birth Mother's mother and the foster mother. N.T. p. 38-39. On these occasions, the children have become upset seeing their Birth Mother express her anger. On one occasion following a permanency review hearing in January of 2014, Birth Mother confronted the foster mother in the parking lot and argued in front of the boys. N. T. p. 40-41. Although the foster mother agreed that Birth Mother has never physically abused the boys and that she loves the boys and is affectionate toward them,

8

she noted that on at least one occasion when it was clear to her that Birth Mother was under the influence of some substance which impaired her judgment, she was unsure whether Birth Mother would have been able to stop the boys from running into the street or engaging in a dangerous activity.

OCY Caseworker George Oscovitz testified that Birth Mother's progress during 2011, after placement of the children, was "rocky". He described Birth Mother as "combative". N.T. p. 112. However, he noted that she began to progress and that in May or June of 2012, she attempted to get drug and alcohol evaluations, was maintaining an apartment, and was working two jobs. N.T. p. 112. Visits were initially scheduled for one time per week but were increased in duration and by the summer of 2012, OCY had begun weekend and overnight visits with the children at the Birth Mother's apartment. During the summer of 2012, Mr. Oscovitz noted few concerns and noted that visits were going well and Birth Mother had activities planned for the children. N.T. p. 112-113. During the period November of 2011 through September 2012, according to Mr. Oscovitz, 31 visits were offered and 7 of these visits were cancelled. N.T. p. 116. On or about October 7, 2012, Birth Mother reported that Birth Father was watching the children, but during the time that he was watching the children, he was drinking and doing drugs and her older son had to watch the younger children. N.T. p. 117. During the same period, she continued to struggle financially. At one point, due to the Birth Father's behavior, OCY determined that visits at the apartment could not continue if the Birth Father was present. After this decision, however, OCY learned that Birth Father was present at the apartment at the time of a scheduled visit. Thereafter, visits were

9

moved to the maternal grandmother's home. N.T. p. 120. Thereafter, visits were again changed to the Pottstown OCY office. N.T. p. 121.

Birth Mother lost her job in December of 2012 and lost her housing in February of 2013 and was struggling financially. In April 2013, Birth Mother attended three of four scheduled visits but cancelled one because she reported she was unable to get a ride. In June, July and August of 2013, Birth Mother attended only two of seven visits offered.

Although Birth Mother did obtain a psychological evaluation, the evaluation recommended that she engage in long-term out-patient psychotherapy. While she admitted that she finds herself in need of counseling from time-to-time when she is, as she put it, "really feeling like I'm going to have a nervous breakdown", she also admitted that she has not engaged in consistent and long-term psychotherapy as recommended. N.T. p. 221.

Birth Mother also admitted that she has, at times, used illegal substances, including methamphetamines and cocaine, and used prescription drugs that were not prescribed for her. Birth Mother testified that she has medical issues that require pain medications as well as anxiety medication and medication for ADHD. She tested positive in drug testing administered by OCY on at least eight occasions: September 14, 2011, February 7, 2012, April 12, 2012, May 19, 2012, September 6, 2013, October 10, 2013, December 26, 2013, and February 18, 2014. Exhibit OCY-12. In October 2013, Birth Mother admitted to her caseworker that at times she has used methamphetamines. At a permanency review hearing on January 6, 2014, Birth Mother testified before Master Imms that she has used illegal drugs during 2013 and that she used Xanax and cocaine since September of 2013. Both Mr. Oscovitz and R.M. also testified that she told them at

10

times that she had used illegal drugs. On October 3, 2013 at the OCY Pottstown office, she admitted to drug use. On January 24, 2014, Birth Mother was arrested in a hotel room where marijuana, methamphetamines and drug paraphernalia were present. Birth Mother's criminal charges were dismissed.

Birth Mother did not demonstrate any insight into her need for long-term psychotherapy or formal drug treatment. Recently, in February of 2014, she was admitted to Valley Forge Medical Center for a detox program. She was discharged on February 10, 2014 before completing the program. She stated that she was unable to complete the program because she had to appear in Court before a Magisterial District Judge. The discharge instructions she received from Valley Forge Medical Center recommended that she enter a 12-step program. Despite this recommendation, since her discharge from that program, she has not sought additional treatment for her addictions nor has she attended Alcoholics Anonymous or Narcotics Anonymous.

With respect to the recommendation that she receive long-term counseling, she stated "I go to counseling when I need to" and "I attend when I am really feeling like I will have a nervous breakdown". N.T. p. 221. However, she has not demonstrated a commitment to or ability to consistently participate in necessary mental health treatment.

Birth Mother admitted to taking Xanax that was not prescribed for her as well as using cocaine, pain pills and methamphetamine. With respect to methamphetamine, she admitted that she used this drug once when with Birth Father, and once after she lost the apartment in February 2013. She disputes the accuracy of some of the positive drug tests results obtained by OCY. However, she also failed to provide urine samples for drug tests on January 2, 2014, January 22, 2014 and January 27, 2014, despite being advised

11

that the failure to provide a sample would result in OCY viewing this failure as the equivalent as a positive drug screen.

Birth Mother described in her own words a history of not only health instability, mental health instability, and drug use but also financial instability and housing instability. N.T. p. 184. At times she has lived with her mother, her stepfather, and her birth father. Each of these residences poses problems for Birth Mother

Since Birth Mother lost her apartment in February 2013, she has had numerous addresses. Most recently, she refused to provide her current address to her OCY caseworker. N.T. pp. 138-139.

Birth Mother is a troubled person who loves her two sons and says that she wants what is best for them. Her problems relating to her health issues, her drug addiction which she has not effectively treated, and her financial instability have been exacerbated by Birth Father's incarceration and inability to contribute to their household. Perhaps the most telling and moving statement by Birth Mother herself was that she did not regret calling OCY initially to obtain assistance and stability for her children when she could not care for them. N.T. p. 218. She continues to attempt to obtain employment and obtain a new residence. However, she has not adequately addressed her drug use and her mental health issues in a sustained way that may assist her in achieving and maintaining stability. Despite her acknowledged drug use, her lack of insight was evident when she contradicted her own testimony, stating, "I never had a problem with drugs."

Birth Mother cares deeply for her two sons and wants what is best for them. She testified she is "willing to do anything" for them. N.T. p. 218.

12

Although Birth Mother desperately wishes to maintain a place of importance in the lives of her sons and a relationship with them, she has not addressed her mental health or substance abuse issues and has not demonstrated that she is capable of providing them with the stable home environment that she knows they need and deserve. She recognized that they need this stability when she called OCY initially and acknowledged that she was struggling and unable adequately to provide the safe, stable home environment that they need and deserved. Despite her passionate expression of her love and affection for the children, she could not articulate a plan to address her needs as well as their needs and has been unable in the three years since they were placed with OCY to maintain a residence, financial stability and recovery from drug addiction.

Evidence of drug testing with the Petitioner reveals positive tests on numerous occasions from September 14, 2011 through February 2014. Birth Mother's continued drug use and continued mental health issues and lack of financial stability and housing stability make it impossible for her to provide the parental care, control, housing, nutrition, comfort, support and consistency necessary for the children's physical and mental well-being. I find that Petitioner has presented clear and convincing evidence that Birth Mother's continued drug use and continuing mental health issues create a parental incapacity and has resulted in neglect of parental duties and an inability to provide a safe and secure home for the children. Moreover, both the drug use and the mental health issues are among the conditions that led to the removal of the children from the parent's care which cannot and will not be remedied by Birth Mother. While Birth Mother has been sober for brief periods of time she has repeatedly relapsed, leaving her children without adequate parental care and supervision.

13

Mother has been unable to provide children with the essential parental care, control, or subsistence necessary for their physical and mental well-being, and the causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by the Birth Mother. Birth Mother's desire for an opportunity to improve her parenting in the future is insufficient to overcome the findings that she has been incapable of meeting the needs of her children to date. In this case, the testimony clearly established that, although Birth Mother loves and plays with the children, the Birth Mother has not provided safety and security for her children.

In this case, the Birth Mother has not provided a home, has not met the children's needs, and has not maintained a consistent and strong parent-child relationship. Her desire to start over at this time is insufficient to meet the needs of her children for consistent and reliable love, affection and responsibility.

Based on the foregoing facts, this Court finds that, with respect to each of the children, OCY had proven by clear and convincing evidence that Birth Mother has failed and refused to perform her parental duties for a lengthy period beyond the six-month period prior to the filing of the petitions, that the conditions that led to placement of the children continue to exist and cannot or will not be remedied by the Birth Mother, and that Birth Mother, C.M., lacks the capacity to meet all of the obligations of a parent to provide a safe, secure and nurturing home for her children.

This Court finds that OCY has met its burden of proof under § (a)(1), § (a)(2) and § (a)(8) by clear and convincing evidence.

At this point, this Court must consider the needs and welfare of each child. Section 2511(b) of the Adoption Act requires this Court to give primary consideration to

14

the developmental, physical and emotional needs and welfare of the children. The Superior Court, interpreting the Adoption Act, has held that "the health and safety of the child supercedes all other considerations." *In re Interest of Lilley, cited supra* at 333. In considering the children's needs and welfare, this Court must consider the role of the parental bond in the child's life and to fully consider whether a parental bond exists to such an extent that severing this natural relationship would be contrary to the needs and welfare of the child. *In re E.M.,* 533 Pa. 115, 620 A.2d 481 (1993). In reviewing the evidence in support of termination under section 2511(b), the Pennsylvania Supreme Court recently stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court 'shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.,* 53 A.3d 781, 791 (Pa. Super. 2012). In In re E.M., [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.,* 53 A.3d at 791.

*In re T.S.M.,* 71 A.3d 251, 267 (Pa. 2013).

The Pennsylvania Supreme Court has observed the delicate balance between preserving the family unit and preventing a state of constant uncertainty and limbo for a child who has no reasonable prospects for returning home to the care of his or her natural parent. In such a case, our Supreme Court has said:

> The policy of restraint in state intervention is intended to protect, where, as here, disruption of the family has already occurred and there is no reasonable prospect for reuniting it without serious emotional harm to the child. . . . the issue is not whether the state should intrude to disrupt an on-

15

going family relationship, but where the state should seek to preserve in law a relationship that no longer exists in fact, with the result that the child is consigned indefinitely to the limbo of foster care or the impersonal care of institutions. *In re William L., supra* at 348-49, 383 A.2d at 1241.

In this case, I find that although Birth Mother sincerely loves her children, the parental bond between Birth Mother and each child is attenuated, as she has been incapable of providing for them in a mature parental way.

By contrast, I find that a significant bond has developed between the foster parents and the children. Caseworker Stephen Pulansky testified that the two boys are "very well loved in their foster home", and that "both children sought out Mr. and Mrs. [M.] to have all of their needs met". Caseworker George Oscovitz testified that "the children are really entrenched with the [foster] family." He also testified that in his opinion the children would not suffer irreparable harm if the parental rights of Birth Mother were terminated.

This Court concludes that the emotional needs and welfare of the children can best be met by termination of the parental rights of Birth Mother, and that the children will not suffer a detriment as a result of termination of the parental rights of their Birth Mother.

In addition, I find that the children are safe in their current placement, that their needs are being met in the foster home, and OCY made reasonable efforts to attempt to reunify the children with their Birth Mother. At this time, I find it is appropriate to change the goal to Adoption.

In addition, I find that the Office of Children and Youth has established a basis for terminating the parental rights of Birth Mother, C.M., to each of the children, and that

16

termination of parental rights will best serve the needs and welfare of each of the

children.

BY THE COURT:

LOIS E. MURPHY                    J.

Copies mailed 9/_30_/14 to:
Christina Terebelo, Esquire
Rochelle O'Herrick – Paralegal OCY
Craig Bluestein, Esquire
Brendan Campbell, Esquire – Father's Atty.
Carla Monahan – Birth Mother – 259 Montgomery Ave, Hillcrest Village,
     Boyertown, PA  19512
Damian Brewster, Esquire

Secretary

17