J-S86043-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: J.F.K. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: E.F., NATURAL FATHER | : | No. 1153 WDA 2016 |

Appeal from the Order Entered June 22, 2016
In the Court of Common Pleas of Jefferson County
Orphans' Court at No(s): 20A-2016 O.C.

| | | |
|---|---|---|
| IN RE: B.R.K. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: E.F., NATURAL FATHER | : | No. 1154 WDA 2016 |

Appeal from the Order Entered June 22, 2016
In the Court of Common Pleas of Jefferson County
Orphans' Court at No(s): 21A-2016 O.C.

| | | |
|---|---|---|
| IN RE: K.J.K. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: E.F., NATURAL FATHER | : | No. 1155 WDA 2016 |

Appeal from the Order Entered June 22, 2016
In the Court of Common Pleas of Jefferson County
Orphans' Court at No(s): 22A-2016 O.C.

BEFORE:  GANTMAN, P.J., MOULTON, J., and STEVENS, P.J.E.*

MEMORANDUM BY GANTMAN, P.J.:                **FILED DECEMBER 02, 2016**

Appellant, E.F. ("Father"), appeals from the order entered in the

_____

*Former Justice specially assigned to the Superior Court.

Jefferson County Court of Common Pleas Orphans' Court, which involuntarily terminated his parental rights to his minor children, J.F.K., B.R.K., and K.J.K. ("Children"). Upon a thorough review of the record, we affirm.

In its opinion, the Orphans' court fully and correctly sets forth the relevant facts of this case. Therefore, we have no reason to restate them. Procedurally, on April 11, 2016, Jefferson County Children and Youth Services ("CYS") filed a petition for involuntary termination of Father's and Mother's parental rights to Children. The parties proceeded to a termination hearing on June 8, 2016, where Mother voluntarily relinquished her parental rights. CYS then presented the testimony of Dr. Allen Ryen, a licensed psychologist, who performed a bonding assessment with Children and Father in March 2016. Dr. Ryen stated that Father exhibited some good parenting skills; however, Dr. Ryen opined that a primary bond did not exist between Father and Children. Dr. Ryen also expressed concern with Children's negative behavioral reactions after Father's visits. CYS next presented the testimony of Danielle Smith, the Children's CYS caseworker. Ms. Smith testified that Father had visited J.F.K. and B.R.K. nine times since the court adjudicated the Children dependent in April 2014. Ms. Smith also stated Father had visited K.J.K. even less frequently during the same period because K.J.K. resides in a residential treatment facility. Ms. Smith further explained that Father had not obtained stable housing or demonstrated his ability to handle the needs of Children. Ms. Smith testified that Children

were in placement with prospective adoptive families. Ms. Smith ultimately opined that grounds for termination of Father's parental rights existed under 23 Pa.C.S.A. §§ 2511(a)(1) and 2511(a)(2), and termination was in the best interests of Children pursuant to 23 Pa.C.S.A. § 2511(b). Father testified on his own behalf at the hearing. Father expressed his love and desire to regain custody of Children. Father also explained that he had recently obtained stable employment and continued to look for a stable housing option. At the conclusion of the hearing, the court took the matter under advisement.

On June 22, 2016, the court terminated Father's parental rights to Children. On July 5, 2016, Father filed a motion for reconsideration, in light of the fact that both J.F.K. and B.R.K.'s foster parents had withdrawn as prospective adoptive families. The court denied Father's motion on July 7, 2016. On July 21, 2016, Father timely filed a notice of appeal and concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i).

Father raises the following issues for our review:

> WHETHER THE [ORPHANS'] COURT COMMITTED AN ERROR AND/OR ABUSE OF DISCRETION IN TERMINATING FATHER'S PARENTAL RIGHTS PURSUANT TO 23 PA.C.S.A. § 2511(A)(1) WHEN FATHER TOOK AFFIRMATIVE ACTION TO ASSERT PARENTAL RIGHTS BY RELOCATING FROM LOUISIANA TO PENNSYLVANIA, WHEN HE MADE ALL POSSIBLE SCHEDULED VISITATION WITH HIS CHILDREN, AND WHEN HE DEMONSTRATED A SERIOUS INTENT TO REESTABLISH AND CONTINUE THE PARENT-CHILD RELATIONSHIP[?]

WHETHER THE [ORPHANS'] COURT COMMITTED AN ERROR AND/OR ABUSE OF DISCRETION IN TERMINATING FATHER'S PARENTAL RIGHTS UNDER 23 PA.C.S.A. § 2511(A)(2) WHEN [CYS] FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT FATHER CANNOT REMEDY ANY CURRENT PARENTAL INCAPACITY[?]

WHETHER THE [ORPHANS'] COURT COMMITTED AN ERROR AND/OR ABUSE OF DISCRETION IN FINDING THAT THE TERMINATION OF FATHER'S RIGHTS WAS IN THE BEST INTEREST OF THE DEVELOPMENTAL, PHYSICAL, AND EMOTIONAL NEEDS AND WELFARE OF THE [CHILDREN?]

(Father's Brief at 3-4).

The standard and scope of review applicable in a termination of parental rights case is as follows:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that it would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue.

We may uphold a termination decision if any proper basis exists for the result reached. If the trial court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result.

*In re Adoption of K.J.*, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008) (internal citations omitted). *See also In re Adoption of C.L.G.*, 956 A.2d 999, 1003-04 (Pa.Super. 2008) (*en banc*).

DHS sought the involuntary termination of Father's parental rights on the following grounds:

**§ 2511. Grounds for involuntary termination**

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be

- 5 -

terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (2), and (b).

"Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa.Super. 2010).

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his…parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted).

Termination under Section 2511(a)(1) involves the following:

> To satisfy the requirements of [S]ection 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. In addition,
>
> > Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to

- 6 -

perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his…conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008) (internal citations omitted). Regarding the six-month period prior to filing the termination petition:

[T]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his…parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005).

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties. *In re A.L.D.*, 797 A.2d 326 (Pa.Super. 2002). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental

responsibilities." ***Id.*** at 340. The fundamental test in termination of parental rights under Section 2511(a)(2) was long ago stated in the case of ***In re Geiger***, 459 Pa. 636, 331 A.2d 172 (1975), where the Pennsylvania Supreme Court announced that under what is now Section 2511(a)(2), "the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." ***In Interest of Lilley***, 719 A.2d 327, 330 (Pa.Super. 1998).

Under Section 2511(b), the court must consider whether termination will meet the child's needs and welfare. ***In re C.P.***, 901 A.2d 516, 520 (Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." ***Id.*** at 520. Significantly:

> In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

***In re Z.P., supra*** at 1121 (internal citations omitted).

"The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state, may properly be considered unfit and have his…parental rights terminated." *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa.Super. 2001). This Court has said:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert [himself] to take and maintain a place of importance in the child's life.
>
> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his…ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the child's] physical and emotional needs.

*In re B.,N.M., supra* at 855 (internal citations omitted). "[A] parent's basic

constitutional right to the custody and rearing of his…child is converted, upon the failure to fulfill his…parental duties, to the child's right to have proper parenting and fulfillment of his…potential in a permanent, healthy, safe environment." *Id.* at 856.

Importantly, neither Section 2511(a) nor Section 2511(b) requires a court to consider at the termination stage, whether an agency provided a parent with reasonable efforts aimed at reunifying the parent with his children prior to the agency petitioning for termination of parental rights. *In re D.C.D.*, 629 Pa. 325, 342, 105 A.3d 662, 672 (2014). An agency's failure to provide reasonable efforts to a parent does not prohibit the court from granting a petition to terminate parental rights under Section 2511. *Id.* at 346, 105 A.3d at 675.

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable John Henry Foradora, we conclude Father's issues on appeal merit no relief. The Orphans' court opinion comprehensively discusses and properly disposes of the questions presented. (*See* Orphans' Court Opinion, filed June 22, 2016, at 5-9) (finding: between April 14, 2014 and April 11, 2016, Father saw J.F.K. and B.R.K. only nine times, once in June 2015, and eight times between January 2016 and March 2016; Father saw K.J.K. even less during this period due to K.J.K.'s placement in residential treatment facility; significantly, Father declined to visit K.J.K. at residential treatment facility;

Father's decision to forego visits with K.J.K., despite availability and offers of transportation assistance from CYS, demonstrated Father's lack of fortitude to put K.J.K.'s needs ahead of his own; while Father did take advantage of visits with J.F.K. and B.R.K., these visits do not evidence Father's willingness and ability to perform parental duties because visits did not require Father to make any real effort to spend time with Children; similarly, Father's decision to relocate from Louisiana to Pennsylvania does not weigh in Father's favor; Father made decision to move without preparation and without employment or housing arrangements in place; in fact, Father's move served only to exacerbate instability that had led to denial of Father's two previous Interstate Compact on Placement of Children ("ICPC") requests; after almost six months in Pennsylvania, Father continues to live in shelter, has recently obtained part-time employment, and does not have identifiable plan to achieve reunification with Children; Father has known unstable housing and employment are obstacles to reunification for significant period of time; nevertheless, Father has repeatedly failed to rectify any of these concerns; Father has continually taken path of least resistance in parenting Children, as exhibited by Father's failure to protect his custody rights when Mother moved to Pennsylvania in 2012, do anything to remove Children from violence between Mother and stepfather, and exert himself to change Children's circumstances, despite their placement in foster care for twenty months; notwithstanding his own failures, Father blames foster care for

Children's behavioral problems; under these circumstances, termination is warranted under Section 2511(a)(1) and (a)(2) due to unlikelihood that Father will remedy causes of parental incapacity within reasonable period of time; moreover, termination of Father's parental rights will serve best interests of Children; J.F.K. and B.R.K. live with foster parents who meet their needs and intend to confirm love and commitment to J.F.K. and B.R.K. through adoption; both J.F.K. and B.R.K. have expressed desire for permanent homes with people they know as "Mom" and Dad"; while K.J.K.'s preferences are less clear, she has foster family who cares for her and intends to welcome her back upon discharge from residential treatment facility; Father's reintroduction in Children's lives has only intensified Children's behavioral issues; in fact, Children's behavioral issues improved after court discontinued Father's visits in March 2016; termination of Father's parental rights will not destroy important emotional bond between Father and Children; Dr. Ryen testified that bond between Father and Children is weak at best, while Children have identifiable bonds with foster parents; termination of Father's parental rights will serve to ensure permanency of Children's bonds with their foster parents; because CYS demonstrated by clear and convincing evidence that termination is appropriate pursuant to 2511(a)(1) and (a)(2), and is in best interests of Children under 2511(b), court properly terminated Father's parental rights). With respect to these issues, we affirm on the basis of the Orphans' court

opinion.

To the extent Father claims the court erred when it denied his motion for reconsideration in light of the withdrawal of J.F.K. and B.R.K.'s foster families as prospective adoptive parents, Father failed to separately identify this issue in his Rule 1925(a)(2)(i) statement. *See Commonwealth v. Johnson*, 51 A.3d 237 (Pa.Super. 2012), *appeal denied*, 619 Pa. 701, 63 A.3d 1245 (2013) (explaining failure to specify issues raised on appeal in Rule 1925(b) statement constitutes waiver for purposes of review). Thus, Father's challenge to the court's denial of his motion for reconsideration is arguably waived.

Moreover, the Orphans' court explained its denial of Father's motion for reconsideration as follows:

> Ms. Smith did indeed testify at the most recent permanency review hearing that [J.F.K. and B.R.K.'s foster families] had withdrawn as [J.F.K.] and [B.R.K.'s] prospective adoptive parents. That development, though unfortunate, does not change the [c]ourt's conclusion that termination of Father's parental rights is in [the Children's] best interests. As the testimony indicated, the [Children's] contact with Father was actually a detriment to their emotion well-being, which is why the [c]ourt terminated visitation over three months ago.
>
> Will the [c]ourt's decision leave the [C]hildren without an immediate plan for a permanent home? Unless [J.F.K. and B.R.K.'s foster families] again change their minds, the answer is yes. As things stand, though, permanency with Father is also a distant prospect. Given his mottled work history, it is still too early to call a few months with Walmart "stable employment," while [Father] frankly admits that he does not yet have an appropriate residence.

In addition, the [C]hildren barely know Father. They were all very young when Mother moved to Pennsylvania, and since then, [J.F.K.] and [B.R.K.] have only spent about 12 hours with him, [K.J.K] even less, and that includes the time all four were together for Dr. Ryen's bonding assessment. Thus, Father's concern that it would take time for [C]hildren to form relationships with "effective strangers" even if CYS identified new prospective adoptive parents in the near future rings hollow, as he, too, falls within that category.

Furthermore, [the decision of J.F.K. and B.R.K.'s foster families] not to adopt does not suddenly qualify Father to raise three children with varied behavioral and disciplinary problems. As the [c]ourt previously observed, [Father] does not demonstrate a realistic perception of what may have precipitated [Children's] issues, let alone the capacity to appropriately deal with them, and his averred willingness to "get training" in that regard is no guarantee from a man who is still homeless after nearly seven months in [Pennsylvania].

In short, Father's parental deficiencies and his [Children's] unfavorable reactions to his reintroduction into their lives leads the [c]ourt to believe that [K.J.K.], [J.F.K.], and [B.R.K.'s] needs and welfare will be best served by terminating Father's parental rights and making them available for adoption, even if that result is not immediately foreseeable.

(Opinion in Support of Denial of Father's Motion for Reconsideration, filed July 7, 2016, at 1-2). The record supports the court's sound reasoning. Accordingly, we affirm.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:   12/2/2016

**IN THE COURT OF COMMON PLEAS OF JEFFERSON COUNTY,
PENNSYLVANIA
ORPHANS' COURT DIVISION**

**FILED**

**JUN 22 2016**

DIANE MAIHLE KIEHL
CLERK OF ORPHANS' COURT
REGISTER OF WILLS

| | | |
|---|---|---|
| **IN RE:**<br>J.F.K.<br>**Date of Birth:** | : : : | **No. 20A – 2016 O.C.** |

| | | |
|---|---|---|
| **IN RE:**<br>B.R.K.<br>**Date of Birth:** | : : : | **No. 21A – 2016 O.C.** |

| | | |
|---|---|---|
| **IN RE:**<br>K.J.K.<br>**Date of Birth:** | : : : | **No. 22A – 2016 O.C.** |

## OPINION OF THE COURT

### Introduction

In petitions filed April 11, 2016, Jefferson County Children & Youth Services ("CYS") asked the Court to involuntarily terminate the parental rights of E.F. ("Father"), to his natural children, J.F.K., B.R.K., and K.J.K..[1] It alleged that termination was appropriate pursuant to 23 Pa. C.S.A. § 2511(a)(1) and (a)(2) and was best suited to meet the children's developmental, physical, and emotional needs and welfare. At a hearing held June 8, 2016, Danielle Smith, the girls' caseworker, and Dr. Allen Ryen, a licensed psychologist specializing in children and families, testified in support of the petitions, while Father testified in opposition. Also present counsel for both parties and Danielle Melillo, Esquire, who was acting as the children's guardian *ad litem*.

### Factual Findings

Father lived with his three children and their mother, S.R.F. ("Mother"), until September 2012, when Mother "took them," in Father's words, and moved to Pennsylvania. Father apparently did not file for custody either here or in Louisiana, the children's home state at the time, and did not make the effort to visit his daughters until June of 2015. By then, the girls had been in placement for fourteen months and had not seen their father for nearly three years. Their relationship throughout that period consisted of frequent telephone calls, first to Mother's residence and then to the children's foster parents, together with cards and gifts.

---

[1] The agency also filed petitions to terminate the natural mother's rights. She chose not to contest the allegations, however, and voluntarily relinquished her rights on the date of the termination hearing.

As the dependency record reflects, Father expressed interest in assuming custody of the girls when CYS first contacted him on April 14, 2014, and the Court ordered the agency to initiate the completion of an ICPC assessment to determine his suitability. A year later, Louisiana submitted an ICPC report in which it withheld a recommendation for placement with Father due to his financial instability and inability to provide outside resources to verify his stability or fitness as a parent.[2] In a second report completed seven months later, Louisiana again disapproved Father as the children's custodian, forthrightly observing that he did not have realistic expectations about how he would care for his daughters under the circumstances. It further identified stable housing and financial stability as custodial prerequisites.

In all that time—from April 2014 through November 2015, Father did not take any affirmative steps to expedite the ICPC process and, as far as the record reflects, did not show any concern over the length of time it was taking. Nor did he take any initiative to rectify the issues that led to his rejection as a custodial candidate in April. Demonstrating the same level of complacency he showed after Mother moved his children thirteen hundred miles away, he merely waited to see how everything evolved, hoping, it would seem, that Louisiana would simply change its mind about his parental fitness.

Louisiana's second rejection likewise did not motivate Father; it was only after the Court told him in December, "They're not going to do it. You're done in Louisiana," that he decided to do more than attend permanency review hearings by telephone and hope for the best, and he was soon on his way to Pennsylvania.

When Father left Kinder, Louisiana in his pick-up truck, which has not been a functional mode of transportation since its registration expired, he did not have any housing or employment prospects. Yet his unstable job history and unsustainable living arrangements were clearly identified as two of Louisiana's foremost concerns with respect to his suitability to assume custody of K.J.K., T.F.K. , and B.R.K.

After arriving in Pennsylvania, it took Father four months to secure part-time employment with Walmart, and as of June 8, 2016, he was still without suitable housing.

---

[2] The caseworker testified that CYS's initial application was rejected as defective, and the ICPC report dated April 10, 2015 reflects that the agency's first successful request was made February 11, 2015. There is no record of when the agency first received notice that Louisiana had rejected its initial application, though, and it is thus unclear why it took ten months to submit an appropriate request.

The month after he arrived in the area, Father began supervised visits with the girls, and between January and the end of March, when the Court terminated contact between the children and both parents, he attended eight of the nine one-hour visits CYS offered him.[3] Not all of those visits included K.J.K., however, as she had been moved to a residential treatment facility on January 29, 2016.

When he was with his daughters, Father conducted himself appropriately. He gave them small gifts and attempted with varying degrees of success to engage them in conversation and play. He even gave the caseworker a gift for K.J.K. on one occasion but declined invitations to visit her in placement, including an offer to ride with the caseworker when she went for a visit.

Although family visits went smoothly at the agency, the girls' behavior indicated that they were emotionally distressing events. Each child became more defiant and aggressive shortly before visits were to occur and had trouble readjusting afterward. B.R.K. reacted so strongly, in fact, that her caseworker and foster parents stopped alerting her to upcoming visits. Once that stressor was eliminated, i.e., once the Court discontinued visits, the children's behavior improved.

Ten days before the Court stopped further visits, Dr. Ryen conducted a bonding assessment with Father and all three children. The primary bonds that likely once existed, he observed, had eroded over time. While mostly comfortable in their father's presence, therefore, the girls were not attached to him. Rather, it was their foster parents whom J.F.K. and B.R.K. knew as "Mom" and "Dad" and with whom they wished to reside permanently—a hope that would become a reality if Father's parental rights were terminated, as it is the foster parents' intention to adopt their foster daughters should that occur.

K.J.K., though, declined to express her permanency preferences, and her immediate future is less certain, as the Court cannot predict how long she will need to stay in residential treatment. Nonetheless, she, too, has prospective adoptive foster parents who call and visit her regularly and will welcome her back into their home when she is ready to reintegrate in a home environment. Meanwhile, Father has not visited her even once despite the availability of free transportation and, while apparently aware of her and her sisters' behavioral issues, could only guess at their origin, 25% of which he attributed to the girls' stepfather and 75% of which he identified as

---

[3] Father was unable to attend a ninth visit due to severe winter weather.

3

stemming from their placement in foster care, and showed no sign that he was competent to address them.

Father testified that he could meet his daughters' needs, of course, including their particularized behavioral concerns, and said he was willing to do whatever was necessary to help them. As the saying goes, however, actions speak louder than words, and Father's actions since September of 2012, and particularly since April of 2014, have belied his averments in a rather dramatic fashion.

Although Mother purportedly "took them" three-and-a-half years ago, Father did nothing to secure his daughters' return or even to establish visitation. Even though he knew that his children witnessed a lot of physical violence between Mother and their stepfather, moreover, he did nothing to remove them from that situation or ensure that they did not also become victims of their stepfather's aggression. Nothing changed after CYS took custody of the children, either; Father continued to practice his *laissez faire* approach to parenting, content to watch events unfold and hoping for the best while assuming that telephone calls and gifts fulfilled his duties as a parent. Yet he knew on April 14, 2014 that K.J.K., J.F.K., and B.R.K. had been removed from Mother's care and would be going into foster care, and he knew over the course of the next twenty months, with permanency review hearings occurring quarterly, that Mother was not making any significant progress toward regaining custody. He also heard the Court announce at the conclusion of each hearing that dependency would continue and that his children would remain in foster care. With no reasonable expectation that Mother would suddenly become a good parent, though, he stayed in Louisiana doing nothing to satisfy CYS's family services plan requirements until the Court told him in no uncertain terms that his chosen course of action was no longer an option if he wanted to be reunited with his daughters.

Father's complacency notwithstanding, K.J.K., J.F.K., and B.R.K. have had their needs met by foster families who love them. More particularly, J.F.K.'s placement is with a therapeutic foster family that, in addition to satisfying the physical, mental, and emotional needs common to all children, has worked to address her particular behavioral concerns, while B.R.K. has so completely identified with her foster family that she has demanded a place on the "family chore chart." Although K.J.K. has proven to be more difficult, moreover, her foster parents' continued visits, phone calls, and intention to be reunited with her once residential treatment is no longer

4

necessary confirm that she has a loving foster family that understands the challenges of raising her and is able and willing to love her regardless.

## Discussion

Under 23 Pa.C.S.A. § 2511(a)(1), termination is warranted where"[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." *Id.* Under that construct, no credit will be given to a parent who, after receiving notice of a petition, attempts to remedy the conditions that warranted it. *In re. E.M.*, 908 A.2d 297, 303 (Pa. Super. 2006). To the extent that it helps establish a more complete history, however, his or her post-petition conduct, as well as his or her actions prior to the start of the six-month timeframe, may be relevant. *Id.* If that history, i.e., the totality of the circumstances, clearly and convincingly supports a petitioner's request for termination, the Court may terminate a person's parental rights. *In re M.G. & J.G.*, 855 A.2d 68, 74 (Pa. Super. 2005).

Subsection (a)(2) articulates separate and distinct requirements, specifying that a parent's repeated and continued incapacity, abuse, neglect, or refusal to parent is cause for termination where it has left the child without essential parental care, control, or subsistence and is not likely to be remedied by the parent, § 2511(a)(2), and in this case, the facts support termination under both subsections.

The law articulates certain minimal standards for parenting. Parental obligation, it says, is a positive duty requiring affirmative performance. *In re Z.P.* 994 A.2d 1108, 1118 (Pa. Super. 2010). Accordingly, it demands that a parent show continuing interest in his child and make a genuine effort to maintain communication. *Id.* A merely passive interest in the child's development cannot satisfy her need for love, protection, guidance, and support. *Id.*

Fulfilling one's parental obligation does not necessitate the impossible, of course, but may entail that which is difficult and demanding. *In re Adoption of T.M.*, 566 A.2d 1256, 1258 (Pa. Super. 1989). Even in difficult circumstances, therefore, a father must act affirmatively, with a good faith effort and interest, to maintain a parent-child relationship to the best of his ability. *Id.* As *In re Burns*, 379 A.2d 535 (Pa. 1977), plainly states, "[P]arental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life.'" *Id.* at 540 (quoting *Appeal of Diane B.*, 321 A.2d 618, 620 (Pa. 1966)).

5

Further refining those principles, our courts have held that a father cannot simply defer to his problems and expect to successfully use them as an excuse for his failure to be a parent. *In re Adoption of T.M.*, 566 A.2d at 1258. Rather, a father faced with obstacles "must act affirmatively to maintain a relationship with [his] children, *even in difficult circumstances.*" *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004)(emphasis added). Here, Father has not met those minimal standards.

Between April 14, 2014 and April 11, 2016, Father saw J.F.K. and B.R.K. only nine times, once in June of 2015 and eight times between January and March of 2016. He saw K.J.K. even less. Her relocation to Beacon Light at the end of January meant that she was not present at regularly scheduled Tuesday visits, and for reasons he did not even attempt to articulate, he chose to forfeit potential visits at the residential treatment facility. The Court knows, though, that any obstacles he faced were not external. His continued unemployment from the time he arrived in the area through the end of March meant he was physically available to visit K.J.K., and Ms. Smith's offer to drive him to Beacon Light meant that his expired registration did not prevent him from seeing her. Perhaps he was instead uncomfortable with the idea of spending that much time in a vehicle with the caseworker or visiting K.J.K. in an unfamiliar environment, surrounded by strangers, or perhaps he was worried that she would not welcome his visit. The Court can only speculate in that regard. What is apparent, however, is that Father lacked the fortitude to put his daughter ahead of his own insecurities, whatever they may have been.

Father did take advantage of his allotted hours with his younger daughters, because J.F.K. and B.R.K. were more accessible and visiting with them was easy. CYS scheduled visits, and CYS made sure the children were present at the appointed time. Father had only to show up and spend an hour with two children who, as Dr. Ryen's bonding assessment would indicate, were more peaceful, predictable, and responsive than K.J.K. Essentially, then, Father did not have to make any real effort to spend time with his younger children, which is why, in light of his irresolution with K.J.K., the Court does not deem those visits to be evidence of a willingness and ability to perform his parental duties.

Father's decision to leave Kinder, Louisiana does not help him, either.

After the Court told him he was done in Louisiana, Father realized that he could not regain custody of his children without coming to Pennsylvania. With no preparation and no apparent forethought, no job and no place to live, therefore, he left Louisiana to make the

6

thirteen hundred-mile trip to his children's home county. That scenario, while it may have worked well in a Hallmark movie, did not achieve the desired result in this case, as it was contrary to what Father knew he had to achieve to regain custody of his children. He had already been rejected on account of financial instability and lack of stable housing, and yet he left for Pennsylvania without even the prospect of employment or housing. After nearly six months in the Commonwealth, moreover, he was only working part-time, was living in a men's shelter, and had no identifiable plan for how he would support himself and three girls.

Father was not making any progress toward reunification before coming here, either. More specifically, he knew months before § 2511(a)(1)'s six-month timeframe commenced that his unstable work history and inability to provide suitable references were unacceptable but did nothing to rectify either concern. He instead provided the same references for purposes of the second ICPC investigation and was still employed sporadically through the same temporary staffing agency. He further responded to the second report, which again explained clearly what issues he needed to address, by doing nothing and likely would have continued down his path of inaction had the Court not clarified that Louisiana was no longer an option if he wanted to get his children back. Instead of using that stern reminder as an impetus to start establishing a stable life, though, Father made one of the most unreasonable decisions he could have under the circumstances, thereby exacerbating rather than alleviating the conditions that resulted in Louisiana's disapproval.

In light of his demonstrated parenting style, Father's choices were not surprising, though, because when it came to his daughters, he always chose the path of least resistance. Accordingly, he took no action to protect his custody rights when Mother moved them to Pennsylvania in 2012; did nothing to get them away from the violence he knew they were witnessing between Mother and their stepfather; and, until they had already been in foster care for twenty months and it had long been apparent that Mother would not be regaining custody, did not exert himself even minimally to change their circumstances. It was not because he thought foster care was in his daughters' best interests, though. On the contrary, he deemed foster care to be 75% responsible for their behavioral problems. He was simply unwilling to make an affirmative effort to get them out of foster care.[4]

---

[4] Father proffered his financial circumstances as the reason he could not do more. As indicated in the November 2015 ICPC report, though, he erected and failed to overcome that obstacle by leaving jobs merely because he did not

History further indicates that Father will not remedy the causes of his parental incapacity within a reasonable period of time. Once again, he learned in April of 2015—more than a year ago—that his unstable work history and lack of appropriate personal references underlay Louisiana's initial disapproval of him as his children's custodian, and he learned in November of that same year—approximately seven months ago—that his housing situation was also unsuitable. At this point, none of those circumstances has changed, and given Father's ill-advised actions thus far and aimless testimony at the termination hearing, the Court has no expectation that they will change anytime soon. Termination, therefore, is warranted in this case.

Termination will best serve the children's needs and welfare, as well. J.F.K. and B.R.K. live with foster parents who have been meeting all of their needs and who intend to confirm their love and commitment through adoption. That is what both girls want, too—permanent homes with the people they know as "Mom" and "Dad." K.J.K.'s preference is not so clear. What is clear, however, is that she also has a foster family that cares for her and intends to welcome her back into their home once she is discharged from residential treatment. What is clear, moreover, is that Father's involvement is actually a detriment to the girls. Whether or not they are comfortable with him, his reintroduction into her life intensified their aggressive behavior, and J.F.K. and B.R.K., at least, have calmed down since the Court discontinued visits.[5]

As evidenced by Dr. Ryen's bonding assessment, termination of Father's parental rights will not destroy an important emotional bond, either. *See In re. Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (reiterating that a court conducting a needs and welfare analysis should consider the emotional bond, if any, between the parent and children). As Dr. Ryen observed, any primary bond that may have existed in the past has become weak at best, which certainly makes sense when one considers that K.J.K., J.F.K., and B.R.K. have known Father as little more than a voice on the telephone for a substantial portion of their lives. Conversely, the younger two, at least, have clearly bonded with their foster parents, and termination of Father's parental rights will ensure the permanency of those bonds.

Because CYS has proven clearly and convincingly that termination is appropriate under 23 Pa. C.S.A. § 2511(a)(1) & (2) and is in the girls' best interests, therefore, the Court will enter

---

like them, leaving another job for the unsecured promise of a diffferent job that never materialized, and getting fired from his most stable position "for attendance and abandoning his job."

[5] The Court wonders, in fact, whether K.J.K.'s transfer to Beacon Light would have become necessary had Father's presence not disrupted the status quo.

8

a decree terminating Father's parental rights of Mother and Father with respect to all three children.[6]

---

[6] Although CYS did not allege subsection (a)(8) as grounds for termination, the Court would note that termination would be appropriate under that provision, as well. As the above facts and analysis reveal, the girls had been in placement well in excess of twelve months by the time CYS filed its petitions, Father had not remedied the conditions that led to their removal, and termination was in their best interests. *In re. P.Z.*, 113 A.3d 840 (Pa. Super. 2015), is instructive in that regard. There the father lived in Arizona when the children were removed and was thus not immediately eligible to take custody. Like Father, therefore, he went through an ICPC investigation and CYS apprised him of the steps he would need to take to address identified deficiencies and be eligible to assume custody of the children. He failed to comply, and our Superior Court affirmed the trial court's termination pursuant to (a)(8). Here the operative facts would warrant a like result.

## IN THE COURT OF COMMON PLEAS OF JEFFERSON COUNTY, PENNSYLVANIA
### ORPHANS' COURT DIVISION

**FILED**

**JUN 2 2 2016**

DIANE MAIHLE KIEHL
CLERK OF ORPHANS' COURT
REGISTER OF WILLS

| | | |
|---|---|---|
| IN RE: | : | |
| J.F.K. | : | No. 20A – 2016 O.C. |
| Date of Birth: | : | |

| | | |
|---|---|---|
| IN RE: | : | |
| B.R.K. | : | No. 21A – 2016 O.C. |
| Date of Birth: | : | |

| | | |
|---|---|---|
| IN RE: | : | |
| K.J.K. | : | No. 22A – 2016 O.C. |
| Date of Birth: | : | |

## DECREE

AND NOW, this **22nd day of June 2016**, in accordance with the foregoing Opinion, it is hereby **Ordered** and **Decreed** that the Petitions for Involuntary Termination of Parental Rights of   **E.F.**   , natural father to   J.F.K. , B.R.K., and K.J.K.

, are **GRANTED.** If no appeal is taken within **THIRTY (30) DAYS**, this will become a final order and adoption proceedings can take place without further notice to the father.

BY THE COURT,

Hon. John Henry Foradora, P.J.

10