J-S40002-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M.P.C. AKA A.M.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: V.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3631 EDA 2017 |

Appeal from the Decrees Entered October 24, 2017
in the Court of Common Pleas of Philadelphia County
Family Court at Nos.:  CP-51-AP-0000896-2017
CP-51-DP-0002681-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M.P.C. AKA A.M.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: V.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3632 EDA 2017 |

Appeal from the Orders Entered October 24, 2017
in the Court of Common Pleas of Philadelphia County
Family Court at Nos.:  CP-51-AP-0000897-2017
CP-51-DP-0002680-2016

BEFORE:   LAZARUS, J., DUBOW, J., and PLATT*, J.

MEMORANDUM BY PLATT, J.:                **FILED AUGUST 20, 2018**

V.C. ("Mother") appeals from the decrees and orders entered October 24, 2017, which granted the petition of the Department of Human Services ("DHS") and terminated her parental rights to her children, Aa.M.P.C. and

_____

*   Retired Senior Judge assigned to the Superior Court.

Au.M.P.C.,[1] (both born in August 2015), pursuant to section 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act, 23 Pa.C.S.A. § 2511, and changed the Children's permanency goal to adoption pursuant to the Juvenile Act, 42 Pa.C.S.A. § 6351. We affirm.

We adopt the following facts and procedural history from the trial court's opinion, which in turn is supported by the record. (**See** Trial Court Opinion, 3/05/18, at 1-9; **see also** N.T. Hearing, 10/24/17, at 1-43).

Mother and E.D. ("Father") became known to DHS following the death of Mother's child, the then thirty-month-old Sa.C., in October 2010. Father claimed that she had urinated on herself and he took her to the bathroom to wash her before leaving her in the tub while he checked on the child's sibling. When he returned, Sa.C. was having difficulty breathing. She was taken to Aria-Torresdale Hospital and pronounced dead. Sa.C. had suffered bruising to her left ribs, flank, thighs, and the left side of her face; she also had a lump on her forehead. An autopsy revealed evidence of old trauma and injuries, and no water in her lungs. Mother informed DHS that the forehead lump was sustained during rough play with Sa.C.'s sister, N.C., and Father claimed the rib injuries were sustained when he attempted to perform cardio-pulmonary resuscitation ("CPR") on Sa.C. Mother and Father were unable to explain Sa.C.'s other injuries.

---

[1] As this case involves minor children, we have redacted names to protect the identities of the children involved. However, there are multiple children with identical initials in this case. Therefore, to distinguish between them where necessary, we refer to each child by the first two letters of their first names.

DHS and police investigations were opened with regard to the death of Sa.C. Her siblings, N.C. and Sy.C., were removed from the home and placed with their maternal grandfather. DHS determined that Father's account of the incident was not credible. Ultimately, the medical examiner determined that Sa.C.'s manner of death was homicide and the cause of death was multiple blunt force injuries and cardiac arrest. As a result, DHS obtained an Order of Protective Custody ("OPC") for N.C. and Sy.C., who were committed to DHS but remained in the care of their maternal grandfather. In November 2010, the court adjudicated N.C. and Sy.C. dependent.

In June 2011, the court found aggravated circumstances existed based on the death of Sa.C. and made a finding of child abuse. DHS requested 1) that the court allow DHS to work with Mother towards reunification with N.C. and Sy.C., and 2) that DHS need not make reasonable efforts to reunite Father with the N.C. and Sy.C. The court granted both requests. Later that month, DHS returned a founded report of child abuse and aggravated circumstances against Mother and Father.

In June 2011, Mother gave birth to Se.C., who was discharged into her care; Father was identified as Se.C.'s father and in-home services were implemented to ensure Se.C.'s safety. In July 2012, the court adjudicated Se.C. dependent, ordered DHS to supervise her, and directed that the criminal stay-away order against Father remain. The court found aggravated circumstances regarding both Mother and Father, and ordered that efforts be

made to preserve the family with regard to Mother, but no efforts towards reunification were necessary as to Father.

In August 2012, Father was convicted of endangering the welfare of a child.[2] In October 2012, Father was convicted of a drug-related offense. Mother gave birth to two more children, D.D., Jr., and L.C., in January 2013 and January 2014, respectively. Their putative father, D.D., Sr., informed DHS that he did not want D.D., Jr., around Father, who was again living with Mother.

In June 2014, DHS made an unannounced visit to Mother's house and Father answered the door. Mother claimed that Father did not reside there. Regardless, the matter was scheduled for an adjudicatory hearing, where the court issued a stay-away order against Father. The court committed Se.C. to DHS. In September 2014, the court discharged the temporary commitment of D.D., Jr., who was in the custody of his father; issued another stay-away order against Father; ordered L.C. and Se.C. remain in status quo; ordered a paternity test for Father as to Se.C.; and involuntarily terminated the parental rights of Mother as to N.C.

In September 2014, D.D., Sr., was murdered. D.D., Jr., was placed temporarily with his maternal grandfather, who also had kinship care of N.C. and Sy.C. In October 2014, a paternity test revealed that Father was L.C.'s biological father. That same month, DHS held a Family Service Plan ("FSP")

---

[2] *See* 18 Pa.C.S.A. § 4304(a)(1).

- 4 -

meeting, setting reunification goals for Se.C. and L.C. and for D.D., Jr., to remain in the home, and objectives for both Mother and Father. In December 2014, D.D., Jr., was placed in foster care.

In January 2015, the court fully committed D.D., Jr., to DHS, ordered the stay-away order against Father as to Se.C. remain in place, and directed that he was to have no in-person visits with L.C. until further order of the court, but that DHS could explore Skype visits. In March 2015, the court kept the same orders in place as to Father, and voluntarily terminated the parental rights of Mother as to Sy.C. Community Umbrella Agency ("CUA") implemented services for the family. In June 2015, CUA held a Single Case Plan ("SCP") meeting, setting objectives for both parents. Mother was to participate in grief therapy, obtain safe housing, and attend visitation; Father was to keep in contact with CUA, comply with his objectives and stay-away order, and keep Skype visits. In August 2015, the Children who are the subject of the instant appeal – Au.M.P.C. and Aa.M.P.C. – were born.

In May 2016, CUA modified Father's objectives and recommended that he participate in individual therapy and follow recommendations. In July 2016, a parenting capacity evaluation of Father recommended that Father obtain consistent employment and housing, and participate in counseling to assist in understanding how his behavior had played a role in the death of Sa.C. If reunification was to remain a goal, visitation should not be increased until Father made progress in the other objectives. Further, the evaluation noted that there were several issues interfering with Father's ability to provide

safety and permanency to his children. These issues included: 1) lack of consistent employment; 2) lack of appropriate housing as a result of his inconsistent employment; 3) his history of multiple arrests; and 4) his lack of insight and ability to anticipate and react to situations that were potentially dangerous for the Children.

In November 2016, DHS received a report alleging that Mother was unable to protect Aa.M.P.C. and Au.M.P.C. Mother allegedly maintained a relationship with Father and allowed him to see the Children, despite the fact that she had obtained a Protection From Abuse ("PFA") order against him. DHS visited Mother's home several times in an attempt to investigate the allegations, but were unable to contact her.

Mother later contacted DHS and denied that Father was the biological father of Aa.M.P.C. and Au.M.P.C. She informed DHS that she worked from 7:00 a.m. to 3:00 p.m. and that her mother supervised the Children during those hours. DHS unsuccessfully attempted two more visits before filing a motion to compel cooperation with a child protective services investigation; the court granted the motion.

During further investigations in December 2016 and January 2017, Mother denied that she had contact with Father or that he had been to her home, and claimed her last contact with him was in 2014. However, in January 2017, DHS discovered Father's "alias" page on Facebook, in which there were pictures and videos of him with Aa.M.P.C. and Au.M.P.C. in Mother's home and in the community. DHS obtained an OPC for the children

and placed them in foster care; later, the temporary commitment was ordered to stand and a stay-away order was issued against Father. The Support Center for Child Advocates were appointed as counsel and guardian *ad litem* ("GAL") for Aa.M.P.C. and Au.M.P.C. on January 17, 2017. On January 9, 2017, Father's parental rights to Se.C. and L.C. were involuntarily terminated.

DHS determined there was sufficient basis to find that aggravated circumstances existed pursuant to 42 Pa.C.S.A. § 6302(2) and (5), as 1) Father had been arrested and convicted of the wrongful death of Sa.C.; and 2) Father's parental rights to other children had been terminated.

In February 2017, the court adjudicated Aa.M.P.C. and Au.M.P.C. dependent, committed them to DHS, and found aggravated circumstances by clear and convincing evidence as to Mother. The court ordered that no further efforts be made to preserve the family and reunify Aa.M.P.C. and Au.M.P.C. with Mother. In April 2017, the court found that clear and convincing evidence established aggravating circumstances as to Father, and ordered that no efforts be made to preserve the family and reunify the Children with Father.

In September 2017, DHS filed petitions seeking to involuntarily terminate Mother's parental rights and change the Children's permanency goal to adoption. In October 2017, the court held a hearing on the termination and goal change petitions. Mother was represented by counsel, although she chose not to testify on her own behalf. (**See** N.T. Hearing, 10/24/17, at 2). Aa.M.P.C. and Au.M.P.C. were represented by a child advocate, Angelique Kuchta, Esquire. (**See id.** at 2, 4). Tieshima Brown, a social worker and CUA

case manager, and Dr. Erica Williams, the forensic psychologist who had performed Mother's parenting capacity evaluation, testified. Following the conclusion of DHS' case in chief, during which the GAL concurred that Mother's parental rights should be terminated, the court granted the petition pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b), and entered decrees terminating Mother's parental rights. The court issued orders changing the Children's permanency goals to adoption.

On November 3, 2017, Mother contemporaneously filed a timely notice of appeal and a concise statement of errors complained of on appeal. *See* Pa.R.A.P. 1925(a)(2)(i). The trial court filed its opinion on March 5, 2018. *See* Pa.R.A.P. 1925(a).

On appeal, Mother raises the following issues for our review:

1. Whether the trial court erred and/or abused its discretion by terminating the parental rights of [Mother] pursuant to 23 Pa.C.S.A. [§] 2511(a)(1) where [M]other presented evidence that [s]he made significant efforts to perform her parental duties[?]

2. Whether the trial court erred and/or abused its discretion by terminating the parental rights of [Mother] pursuant to 23 Pa.C.S.A. [§] 2511(a)(2) where Mother presented evidence that she made significant efforts to remedy any incapacity or neglect[?]

3. Whether the trial court erred and/or abused its discretion by terminating the parental rights of [Mother] pursuant to 23 Pa.C.S.A. [§] 2511(a)(5) where evidence was provided to establish that the children were removed from the care of Mother, however Mother is currently capable of caring for the children and the conditions which led to removal have been remedied[?]

4. Whether the trial court erred and/or abused its discretion by terminating the parental rights of [Mother] pursuant to 23

Pa.C.S.A. [§] 2511(a)(8) where evidence was presented to show that Mother is currently capable of caring for her children and the conditions which led to removal have been remedied[?]

5. Whether the trial court erred and/or abused its discretion by terminating the parental rights of [Mother] pursuant to 23 Pa.C.S.A. [§] 2511(b) where evidence was presented that [Mother] has a parental bond with the child[ren] that would be detrimental to sever[?]

(Mother's Brief, at 8).

We will address Mother's issues, all of which challenge the trial court's termination of her parental rights to the Children, together. We review cases involving the termination of parental rights according to the following standards.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. [A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Here, the court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b). Termination requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence

that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). To affirm, we need only agree with any one of the subsections of 2511(a), as well as subsection (b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). We focus our analysis on sections (a)(2) and (b).

The relevant sections of 23 Pa.C.S.A. § 2511 provide that:

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings,

income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

In the instant case, Mother claims that the court erred in terminating her rights under section 2511(a)(2) because she has attended mental health treatment for two years, the case was open for only nine months, and testimony established that she has the potential to have the capacity to provide safety and permanency for the Children. (**See** Mother's Brief, at 18-19).

The petitioner for involuntary termination under this section must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." **In Interest of Lilley**, 719 A.2d 327, 330 (Pa. Super. 1998) (citation omitted). The grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied. **See In re Z.P.**, 994 A.2d 1108, 1117 (Pa. Super. 2010). Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties. **See id.** at 1117-18.

Here, Mother claims that the court erred in terminating her parental rights pursuant to subsection (a)(2), because she has complied with her

- 11 -

objectives and remedied the causes of incapacity, abuse, or neglect. (**See** Mother's Brief, at 17-18). Specifically, Mother points to the parenting capacity evaluations, which showed that she was attending mental health treatment consistently and had a good employment history. (**See id.** at 18). Mother notes the case was open only nine months before her rights were terminated and during the time she was actively working towards reunification, and had the potential to provide safety and permanency to her children. (**See id.**).

However, Mother minimizes other evidence introduced at the termination hearing, namely that the conditions which led to the removal of the Children from the home still existed. Specifically, Dr. Williams testified that Mother remained in contact with Father, despite his role in Sa.C.'s death and the termination of Mother's parental rights to her other children for similar behavior. (**See** N.T. Hearing, 10/24/17, at 9-10, 14). The PCE specifically stated that the Children's contact with Father was unsafe, and that was the main reason they should be removed from Mother's care. (**See id.** at 14). Dr. Williams further testified that despite Mother's regular attendance in therapy, she did not seem to demonstrate responsibility or understanding of the cause of Sa.C.'s death. (**See id.** at 11). Dr. Williams recommended that visitation not be increased until Mother was able to demonstrate responsibility and understanding of the cause of Sa.C.'s death; if she could not keep the children safe, ultimately, she could not be their provider. (**See id.** at 12).

Thus, although it was Dr. Williams' opinion that Mother had the ability to meet the Children's material needs, she currently lacked the capacity to

provide safety and permanency for them. (***See id.*** at 12-13). If Mother could not comply with the safety objectives, namely, avoiding contact with Father, the Children would ultimately not remain in Mother's care permanently. (***See id.*** at 13). Mother had been attending therapy and receiving recommendations to stay away from Father for five years, and had not been able to avoid him. (***See id.*** at 15).

Accordingly, DHS proved by clear and convincing evidence that Mother failed to remedy the conditions that had led to her incapacity over the course of five years. The trial court did not abuse its discretion in finding cause for termination under subsection (a)(2). ***See Lilley***, ***supra*** at 330; ***In re Z.P.***, ***supra*** at 1117.

Next, we must consider whether the Children's needs and welfare will be met by termination pursuant to subsection (b). ***See In re Z.P.***, ***supra*** at 1121. "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." ***Id.*** (citation omitted). The court is not required to use expert testimony, and social workers and caseworkers may offer evaluations as well. ***See id.*** Ultimately, the concern is the needs and welfare of the child. ***See id.*** Further,

> [i]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of

continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.J.P.*, 114 A.3d 1046, 1054 (Pa. Super. 2015) (citation omitted). We have also noted that

> [b]efore granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the intangible dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. Continuity of relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child[ren]'s needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

*In re Z.P.*, *supra* at 1121 (citation omitted). We may not consider any effort by the parent to remedy the conditions in subsection (a)(1) if that remedy was initiated after the parent was given notice of the filing of the termination petition, and this evidentiary limitation applies to the entire termination analysis. *See id.*

Here, there was evidence that the Children have a bond with Mother. (*See* N.T. Hearing, 10/24/17, at 30, 33). However, there was also testimony that, despite the bond, the Children would be harmed if increased interaction were to occur without the possibility for permanency. (*See id.* at 13). Further, the Children have a healthy relationship, attachment to, and bond with their current caregiver, who provides for their medical and specialized therapy needs. (*See id.* at 31-32). There was no specific evidence introduced

to show that terminating Mother's parental rights would cause the Children irreparable harm.

After review, we conclude that the trial court did not abuse its discretion in finding that the Children's needs and welfare would be met by termination, where Mother is unable or unwilling to address the situations and harmful relationships that led to the death of one child and the termination of her parental rights to other children, despite many years of therapy and intervention by the court system. Accordingly, we affirm the decrees and orders of the trial court.

Decrees affirmed. Orders affirmed.

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/20/18