J-S68030-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | |
|---|---|
| IN RE: A.P.-S., A MINOR | : IN THE SUPERIOR COURT OF |
| | : PENNSYLVANIA |
| | : |
| APPEAL OF: T.P.-S., MOTHER | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : No. 897 WDA 2018 |

Appeal from the Order May 18, 2018
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000189-2017

BEFORE: SHOGAN, J., DUBOW, J., and STEVENS*, P.J.E.

MEMORANDUM BY DUBOW, J.:                    FILED DECEMBER 31, 2018

T.P.-S. ("Mother") appeals from the May 18, 2018 Order involuntarily terminating her parental rights to her minor daughter A.P.-S., ("Child"), born in November 2012.[1]  Because the record supports the decision of the orphans' court, we affirm.

SUMMARY OF FACTS AND PROCEDURAL HISTORY

Child was born in November 2012; at the time of her birth, Mother was fourteen years old and herself a dependent child in foster care.  N.T., 5/17/18,

---

[1] A petition seeking to involuntarily terminate the parental rights of S.D.D., Child's putative father, was also filed.  On May 17, 2018, the Allegheny County Office of Children, Youth, and Families ("CYF") withdrew its petition following S.D.D.'s death in January 2018.  Mot. to Withdraw, 5/14/18, at ¶¶ 1-6; Order, 5/17/18, at 1.  On May 18, 2018, the parental rights of any unknown father were also terminated. No putative father has filed an appeal from that order.

---

*   Former Justice specially assigned to the Superior Court.

at 10.[2] When Child was approximately one year old, Mother fled with her. Id. at 10. After authorities recovered Child, CYF obtained an emergency custody Order. Id.

Child was adjudicated dependent on October 23, 2013, and placed in a foster home while Mother was placed in a youth emergency shelter. Id. at 10-11. Mother's goals were to obtain mental health and domestic violence counseling, attend parenting classes, complete drug and alcohol counseling, continue visitation with Child, and work towards obtaining a General Equivalency Diploma ("GED"). Id. at 11, 18.

Mother did not complete most of her goals. Id. at 17, 22-25, 31-41, 89-95, 209-11. Since Child's adjudication, Mother and Child have cycled through twelve placements, some together and some apart. Id. at 35-48, 56. Additionally, Mother's two other children,[3] who are not the subjects of this appeal, are in the primary care of their father and paternal grandmother. Id. at 148-49, 208.

On November 8, 2017, CYF filed petitions to terminate involuntarily the parental rights of Mother and change Child's permanency goal to adoption. In

_____

[2] Mother had been removed from her home as an infant, returned to the care of her mother, and removed again at the age of five. Id. at 21. Mother was subsequently adopted, but after she reported sexual abuse at the hands of her adoptive sibling, Mother returned to the custody of the Allegheny County Office of Children, Youth and Families ("CYF") at age twelve. Id. at 20-21, 54.

[3] Mother's other children are a son, born in June 2016, and a daughter, born in January 2018. Id. at 73-76, 87.

addition to the guardian ad litem who had represented Child throughout the dependency proceedings, the court appointed legal counsel to represent Child at the termination hearing. The orphans' court held a hearing on the petition on May 17, 2018. At the conclusion of the hearing, the court terminated Mother's rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).

Mother timely filed a notice of appeal from the termination decree on June 15, 2018, along with a concise statement of errors complained of on appeal. The orphans' court filed an opinion pursuant to Pa.R.A.P. 1925(a) on July 17, 2018.

ISSUES ON APPEAL

Mother raises the following claims for our review:

I. Whether the trial court committed fatal error and/or abused its discretion in finding that the Office of Children, Youth, and Families met their burden of proof and proved by clear and convincing evidence that the parental rights of [Mother] should be terminated pursuant to 23 [Pa.C.S. §] 2511(a)(1), (a)(2), (a)(5), and (a)(8)?

II. Whether the trial court erred and/or committed a fatal error and/or abused its discretion by finding that the Office of Children, Youth and Families met their burden of proof and proved by clear and convincing evidence that terminating the parental rights of [Mother] best meets the needs and welfare of [Child] pursuant to 23 [Pa.C.S. § 2511(b)]?

III. Whether the trial court committed fatal error and/or abused its discretion in allowing hearsay testimony in the form of written documents of persons who were not present at the hearing to terminate the parental rights of [Mother]?

Mother's Brief at 1 (unnecessary capitalization and suggested responses omitted).[4]

LEGAL ANALYSIS

We review cases involving the termination of parental rights according to the following standards.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013) (internal citations and quotations omitted).

> Termination requires a bifurcated analysis:
>
> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

---

[4] We have reordered Mother's questions for ease of analysis.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). As CYF argues that it proved by clear and convincing evidence that grounds for termination existed under 23 Pa.C.S. § 2511(a)(2), we focus our analysis on subsection (a)(2) and (b).

The relevant subsections of 23 Pa.C.S. § 2511 provide:

(a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

Termination Pursuant to Section 2511(a)(2)

We first address whether the orphans' court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2).

To satisfy the requirements of Section 2511(a)(2), the moving party must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." See In Interest of Lilley, 719 A.2d 327, 330 (Pa. Super. 1998). The grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied. In re Z.P., 994 A.2d 1108, 1117 (Pa. Super. 2010). Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties. Id. Further, "evidence concerning a parent's ability to care for another child is irrelevant and inadmissible in a proceeding to terminate parental rights with regard to the child at issue." In re A.L.D., 797 A.2d 326, 338 (citations omitted).

Here, the court based its decree on Mother's inconsistency, over the course of the five years Child has been in care, in working towards the development of parenting skills and in obtaining mental health counseling. Trial Court Opinion, 7/17/18, at 13. The court found that mental health counseling would be crucial to Mother's ability to successfully parent Child. Id. The court noted that although Mother had taken some steps towards improving her parenting skills with her other two children, who were not in her primary custody, the improvement was "too little too late." Id. at 14.

In response, Mother argues that the record does not mention the specific reason Child came into care.[5]  Mother's Brief at 9.  Mother acknowledges that the court provided her with goals for reunification, but argues that testimony showed that she had made a significant change in her attitude and commitment to her children, including Child.  Id.  Mother points to the testimony of the paternal grandmother of her son, who stated she has no issues leaving her grandson with Mother and has no concerns about Mother's parenting ability.  Id.

Following a thorough review of the record in this matter, we conclude that the orphans' court did not abuse its discretion in granting the petition pursuant to Section 2511(a)(2).  During the termination hearing, CYF presented the testimony of caseworker Kelly Nelson, who testified that the trial court had ordered Mother to complete a series of reunification goals.  N.T., 5/17/18, at 22.  These goals included obtaining mental health and domestic violence counseling, attending parenting classes, completing drug and alcohol counseling, continuing visitation with Child, and obtaining a GED.  Id. at 11, 18.

Mother did not comply with the goal for continued visitation with Child. Josh Rowe, placement coordinator and foster care worker, Emily Cronquist, visitation coach, and Chelsea Jacobs, permanency specialist, for Project STAR ("Steps to Achieving Resilience"), testified regarding Mother's visitations with

_____

[5] Mother does not further elaborate on this argument.

Child. Id. at 170-196. In March 2017, Mother attended eleven of sixteen supervised visits. Id. at 190-91. Mother paid more attention to her son, causing Child to engage in negative, attention-seeking behaviors. Id. at 192. In May 2017, Mother began coached visits with two-hour visits two times per week. Id. at 171. She attended forty-one of seventy-eight offered visits, with sporadic attendance. Id. at 172-73. Her attendance dropped off following her most recent pregnancy, and she was eventually removed from the program in March 2018 after missing three visits in thirty days several times. Id. at 174-79. In March 2018, Mother was offered un-coached, supervised visits, but attended only one of twenty offered visits. Id. at 181-82.

Mother did not obtain her GED. Id. at 18, 21-22. Mother did obtain a job with a home healthcare agency, but has not had any assignments since the birth of her youngest child. Id. at 159-60, 167. Mother did complete drug and alcohol counseling. Id. at 17.

Although Mother completed a parenting program orientation and three classes in October 2013, following her carousel of placements over the next three years, she never completed parenting classes. Id. at 22-32, 209-11. During that time, Mother failed to show appropriate parenting skills by failing to provide appropriate sleeping accommodations for the children or to bathe and feed the children regularly or appropriately. Id. at 40. Mother presented testimony from S.W., the paternal grandmother of her two younger children, that Mother has her own residence which she keeps reasonably clean, has

toys for the children, bathes them, and does not yell at them. Id. at 74-76. However, Mother does not have primary custody of either of her younger children. Id. at 47, 58, 104. Further, as noted above, Mother's attempt to parent another child does not demonstrate that she is capable of providing safety, security and stability for the Child, especially in light of Mother's unwillingness to even visit the Child regularly.

Mother had an initial assessment for mental health services in June of 2015, but did not attend further appointments. She attended some counseling while at a shelter in 2013, but provided no evidence of the completion of goals. Id. at 41-45. She only completed some anger management sessions but overall failed to complete her mental health goals. Id. at 43. Although referred to domestic violence services, Mother did not believe she needed to work on those issues because she was not in a relationship at the time. Id. at 221-22. Dr. Patricia Pepe, a psychologist who performed an interactional evaluation of Child, foster parents, and Mother, testified regarding her concerns about Mother's mental health. Id. at 85-106. Mother has a deflated sense of self for which she overcompensates with narcissism that causes her to reject treatment, and has a paranoid personality disorder which causes her to mistrust others and reject counseling. Id. at 88-90. Additionally, Mother suffers from post-traumatic stress disorder. Id. at 106. Without further counseling, Mother is likely to repeat the unhealthy relationship patterns of victimization that have troubled her throughout her life. Id.

Accordingly, the record confirms that Mother is incapable of parenting Child and that she cannot or will not remedy her parental incapacity. Mother did not complete her parenting goals. Specifically, she was inconsistent with visitation, did not complete parenting classes, was not compliant with mental health counseling, and indeed, did not believe that she required mental health counseling. By the time of the hearing, Child had been in foster care since March 2017, and had been in various placements since 2013, and was in need of permanence and stability. It is clear that Mother will not be able to provide for these needs at any point in the future, and accordingly, the record supports the court's findings and conclusions with respect to Section 2511(a)(2).

**Termination Pursuant to Section 2511(b)**

With respect to Section 2511(b), we consider whether Child's developmental, physical, and emotional needs and welfare will be best served by the termination. Z.P., 994 A.2d at 1121. "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." Id. The court is not required to use expert testimony, and social workers and caseworkers may offer evaluations as well. Id. Ultimately, the concern is the needs and welfare of a child. Id. Where there is no evidence of a bond between the parent and child, it is reasonable to infer that no bond exists. In re: K.Z.S., 946 A.2d 753, 763 (Pa. Super. 2008).

We have noted

> [b]efore granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the intangible dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. Continuity of relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child[ren]'s needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

Z.P., 994 A.2d at 1121 (quoting In re C.S., 761 A.2d 1197, 1202 (Pa. Super. 2000)).

Here, there was evidence of a relationship between Mother and Child. During interactions with Mother, Child was happy, smiling, and physically affectionate; Mother was positive and appropriate with her. Id. at 97-98. Child stated that if she could not see "mommy," she would be sad. Id.

However, the court also considered Child's need for stability and permanency, and evidence of her strong bond with her foster parents. Specifically, Child was relaxed with her foster parents and referred to them as mommy and daddy, and showed appropriate affection towards them. Id. at 105. There were multiple bonding behaviors suggestive of a positive attachment. Id. Additionally, foster parents were meeting Child's needs. Child had previously had behavioral problems which included physical aggression and sexualized behaviors. Id. at 100-103. Currently, Child receives psychotherapy and does not exhibit those behaviors any longer, nor does she suffer nightmares. Id.

Dr. Pepe noted that

> [Foster parents have] really provided her with an enriched environment and a structured, consistent, stable environment, which is – I can't stress the importan[ce] of that, because she has moved so many times at such a young age that she's at such tremendous risk for ongoing psychological problems that, you know, it's very positive that she's stabilizing and developing age-appropriate behaviors . . .
>
> [I]f [Child] were to move again, she would be at such high risk of reactive attachment disorder and for multiple psychological problems, because we wouldn't know that she would be stabilized with her mother . . . So it's time this child has to have stability.

Id. at 105-107.   Additionally, Dr. Pepe opined that the Child's bond with Mother was not sufficiently meaningful to Child that the severance of the bond would be detrimental to the Child:

> I think that [Child] would be sad and I think she would miss her mother, but I don't think it would have an enormous impact on her current functioning.
>
> You know, she's very much separate from her mother and she's become adjusted to that.   I mean, she's said she's sad.   She misses her mother.  I mean, she missed her mother because there wasn't consistency.   But, you know, when you weigh it, which is – you know, it's always a balancing act.
>
> I certainly believe that it's much more in her psychological interests to have a permanent and stable residence where her needs are being addressed and where she's succeeding . . .
>
> I think it would be beneficial for the child to be able to be placed permanently through adoption . . . I believe [Child] very much needs permanency . . . and I do believe adoption would be in her best interests.

Id. at 124-26.

As required by Section 2511(b), the court weighed the importance of the relationship between Mother and Child against Child's need for

- 12 -

permanency and stability, and concluded that termination would best serve Child's needs and welfare. The court noted with concern that Mother had not completed parenting classes, and had not attended any mental health counseling. Accordingly, the court concluded that Child's need for permanency and stability outweighed the importance of the relationship that Child had with Mother, and that foster parents, a pre-adoptive resource, were a positive stabilizing force in Child's life.

Based on the foregoing, we conclude that the orphans' court did not abuse its discretion by terminating Mother's parental rights involuntarily.

Evidentiary Issues

Finally, Mother contends that the trial court erred in "allowing hearsay testimony in the form of written documents and statements of persons who were not present at the hearing." Mother's Brief at 11.

Appellate briefs must conform to the Pennsylvania Rules of Appellate Procedure. Pa.R.A.P. 2101. "Where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived." Umbelina v. Adams, 34 A.3d 151, 161 (Pa. Super. 2011) (citation omitted). "This Court will not act as counsel and will not develop arguments on behalf of an appellant." Commonwealth v. Kane, 10 A.3d 327, 331 (Pa. Super. 2010) (citation omitted).

In her brief, Mother cites to six pages in the record where she claims she objected to the admission of inadmissible hearsay. Id. at 11. The first

three objections occurred during the testimony of the caseworker investigating Mother's living situation; the second three objections occurred during the testimony of Dr. Patricia Pepe, testifying as an expert witness. N.T., 5/17/18, at 28-30; 101-103. Mother does not further elaborate on any hearsay exceptions that might apply to those instances, provide further citation to authority beyond a general recitation of the definition of hearsay itself, or discuss specifically the ways in which the cited testimony constituted inadmissible hearsay. Id. at 11-12. Because of these significant defects we are unable to conduct a meaningful review of Mother's claims; accordingly, she has waived this claim.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/31/2018